**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
-------------------------------------------------------------------- x

WILFRED SAMUEL RATTIGAN,                              x

                  Plaintiff,                         x       **1:04 CV 02009 (ESH)**

   -against-                                        x       **SECOND AMENDED**
                                                       **COMPLAINT**

ALBERTO GONZALEZ, Attorney General, United       x
States Department of Justice;                             **JURY TRIAL**
                                               x       **DEMANDED**

                 Defendant..
-------------------------------------------------------------------- x

## PRELIMINARY STATEMENT

    1.      This is a civil action in which the plaintiff, WILFRED SAMUEL RATTIGAN

(hereinafter referred to as "Rattigan"or "Plaintiff"), a current employee of the Federal Bureau of

Investigation (hereinafter referred to as the "FBI" or the "Bureau"), seeks relief for violations of

his rights secured by Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000e et seq., as a result

of discrimination in the terms and conditions of his employment by the FBI on the basis of his

race, national origin and religion, retaliation for complaints he has made about his treatment and

by creating a hostile working environment through a series of related actions taken by the same

set of administrators.  The plaintiff seeks damages, both compensatory and punitive, affirmative

and equitable relief, an award of costs and attorneys fee, and such other and further  relief, as this

Court deems just and equitable.

## JURISDICTION

    2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§1331, 1343(3), this being

an action seeking redress for violation of the plaintiff's constitutional and civil rights.

    3.      Plaintiff's claim for declaratory and injunctive relief is authorized by 28 U.S.C.

§2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

4.      The plaintiff demands a trial by jury on each and every one of his claims as pled herein.

## VENUE

5.      Venue is proper for the United States District Court for the District of Columbia pursuant to 29 U.S.C. §621 et seq., and 28 U.S.C. §§1391 (a), (b) and (c).

## EXHAUSTION

6.      On May 6, 2002, plaintiff filed an internal complaint with the FBI's EEO Office alleging discrimination on account of his race and national origin as well as the creation of a hostile working environment.  The date of his first contact with an EEO official in the agency was October 26, 2001.   On July 8, 2002, plaintiff contacted the FBI's EEO Office to request that his complaint be amended to include an allegation that he was the subject of a baseless investigation in retaliation for EEO activity.  By letter dated August 6, 2002, the FBI's EEO Office accepted for investigation both the plaintiff's discrimination complaint based on race and national origin, and his retaliation complaint.

7.      On May 24, 2004, Joel A. Kravetz, Administrative Judge in the Washington Field Office of the United States Equal Employment Opportunity Commission, granted plaintiff's request to withdraw his complaint before the agency so that he might pursue his remedies in court.  This original complaint was filed within 90 days of the order granting plaintiff the right to withdraw his administrative charge.

8.      The plaintiff filed two additional administrative complaints of discrimination against the FBI.  One, filed on March 16, 2004, based on an initial contact with his EEO

2

counselor on July 21, 2003, set forth claims of race, religion, national origin discrimination and retaliation. A third complaint, based on an initial contact on August 23, 2004, was filed with the FBI on November 5, 2004.

8.      On or about August 18, 2004 the plaintiff was advised that because of the pendency of this lawsuit, no further administrative action would be taken on his second or third complaints.

## PARTIES

9.      The Plaintiff, WILFRED SAMUEL RATTIGAN, is a citizen and resident of the United States, and is currently a resident of the County of Queens, State of New York. Plaintiff, a Black male of Jamaican descent, received a B.A. in 1981 from John Jay College of Criminal Justice, and a J.D. in 1984 from Howard University. Plaintiff is currently licensed to practice law in the states of New York and Connecticut.

10.      The Defendant, ALBERTO GONZALEZ, is the Attorney General of the United States, and in that capacity is the chief executive officer of the United States Department of Justice, of which the Federal Bureau of Investigation is a component.

## STATEMENT OF FACTS

11.      In December 1987, plaintiff was hired as a special agent with the FBI at an entry grade level. Following graduation from the FBI Academy in March 1988, Plaintiff was assigned to the FBI's New York Office ("NYO"), Foreign Counterintelligence Division. Plaintiff was later transferred to the Organized Crime Division in the NYO where his assignments centered primarily on the investigation of drug gangs. During this period, plaintiff also participated in several undercover operations in the Philadelphia and Tampa Divisions of the FBI. In 1996,

plaintiff was transferred to the FBI office at the JFK International Airport, where his duties included the investigation of white-collar crimes, cargo thefts, crimes aboard aircrafts and terrorism.

12.    At all times relevant hereto, the FBI has maintained a number of offices around the world, known as Legal Attache Offices or "LEGAT" offices as they are known within the Bureau.  These offices are managed by the Office of International Operations ("OIO").

13.    In February 1999, plaintiff, based on an earlier application, was transferred to the U.S. Embassy in Riyadh, Saudi Arabia and assigned to the Office of the Legal Attaché ("LEGAT Riyadh"), as the Assistant Legal Attaché ("ALAT").  His immediate supervisor was the Legal Attache (LEGAT) in Saudi Arabia, Bassem Youssef ("Youssef").

14.    At the time that plaintiff began his assignment in Saudi Arabia, LEGAT Riyadh maintained territorial responsibility for the entire Arabian Peninsula: Kuwait, Saudi Arabia, Bahrain, Oman, United Arab Emirates, Yemen and Qatar.

15.    From February 1999 to approximately July 2000, plaintiff assumed the duties of ALAT Riyadh after which he was promoted to LEGAT Riyadh.  During plaintiff's entire assignment in Riyadh, the LEGAT Riyadh was budgeted by the FBI for a permanent staff consisting of three people: one (1) LEGAT, one (1) ALAT, and one (1) Office Assistant ("OA").

16.    In Riyadh, Saudi Arabia, the plaintiff was responsible for pursuing international aspects of the FBI's investigative mandate through established liaison with principal law enforcement and intelligence/security services throughout the Arabian Peninsula; providing a prompt and continuous exchange of information with the various foreign law enforcement and intelligence agencies on the Arabian Peninsula; and, facilitate training to his Arabian Peninsula

4

counterparts in crime-fighting techniques and methods.

17.     From plaintiff's arrival in Riyadh on or about February 3, 1999, until Youssef's departure in or about June 1999, the FBI subjected the plaintiff to discriminatory treatment, through the actions of Youssef and others, based on his race and/or national origin.  This includes, *inter alia,* the failure to inform plaintiff about key events and developments, the failure to involve the plaintiff in significant meetings or provide results of same, the failure to permit the plaintiff to attend Arabic language classes on his own time, the failure of supervisory personnel in the FBI to respond to complaints the plaintiff made about how he was being treated by Legat Youssef, and the initiation of an unauthorized file review of files maintained by the plaintiff, which led to a false and misleading performance report being submitted to the Inspection Division of the FBI based on this unauthorized file review.

18.     That this conduct was based on plaintiff's race and national origin is demonstrated by the fact that white FBI agents in plaintiff's position were not treated in the same manner, including plaintiff's predecessor as ALAT in Riyadh, Mark Sofia.  Youssef's conduct toward the plaintiff resulted in severe embarrassment to plaintiff, and created a perception in the U.S. embassy community in Riyadh that plaintiff was incompetent, thereby precipitating tensions in the LEGAT Riyadh office.

19.     Notwithstanding this conduct, in or about July 2000, the plaintiff was promoted to the position of LEGAT Riyadh.

20.     Throughout the period of time that the plaintiff was LEGAT Riyadh, the defendant, acting through the same set of management personnel, including, *inter alia*, Director Robert Mueller, III; OIO Deputy Assistant Director ("DAD") Leslie Kaciban, Jr.; OIO Special

Agent in Charge ("SAC") Roderick Beverly; OIO SC Michael Pyszczymuka; OIO Unit Chief ("UC") Cary Gleicher, OIO UC Susan Curtis; OIO UC Sandy Fowler; and, Executive Assistant Director ("EAD") Pasquale D'Amuro, subjected the plaintiff personally to a hostile work environment based on his race, national origin and religion and also retaliated against him for filing administrative complaints of discrimination against the agency.  Their actions were designed to humiliate and embarrass the plaintiff, undermine his efficiency as LEGAT Riyadh, were not justified by any legitimate agency objective, and were ultimately intended to serve as a pretext to justify his involuntary transfer from Riyadh and/or force his resignation from the FBI.

21.      The conduct of the defendant, acting through the above named management personnel, which constituted a hostile working environment, including, *inter alia*, the following:

a.      the failure to provide adequate resources to Rattigan so that he could successfully manage LEGAT Riyadh;

b.      the failure to provide resources to Rattigan that white Legats were typically provided with;

c.      being threatened and insulted by DAD Leslie Kaciban who said to the plaintiff, on January 25, 2001, "If I catch you doing something…you won't be talking to Santana, the gas station attendant, you'll be talking to me, and I promise you I'll cut your balls off," a statement that the plaintiff understood to reflect extreme racial bias and animus;

d.      the failure of the FBI to investigate or punish DAD Kaciban for making what Rattigan perceived to be a racially biased statement;

e.      the deliberate bypassing of plaintiff by UC Cary Gleicher, in seeking information from Saudi Arabia concerning a sensitive issue under investigation, a matter that

6

Rattigan subsequently raised with Gleicher as evidence of racial discrimination since it was Rattigan's reasonable belief that Gleicher would not have acted in this manner with other LEGATs who were white.

f.    the inexplicable failure of the FBI to provide Rattigan with additional support in the investigation following the terrorist attack on September 11, 2001, even though the workload of the Riyadh office increased many fold because of that investigation, particularly since LEGAT offices headed by white agents were afforded almost immediate assistance by the Bureau, e.g., LEGATs Berlin and Ottawa, while other offices, like London, had more help than was necessary;

g    the reference by DAD Kaciban at a meeting on or about September 30, 2001, held a meeting in Washington, D.C. to discuss, among other things, the 9/11/01 investigation, and LEGAT Riyadh, at which time Kaciban reportedly stated the following:  "Let's see how much his (plaintiff's) Arab brothers are going to help him on this one."

h.    the failure of the Bureau to increase Riyadh's permanent staff or implement a regular rotation of temporary personnel for an extended period, as it did for the Plaintiff's white LEGAT counterparts in other locations, such as Ottawa, Berlin and London;

i.    the initiation of an unfounded investigation by UC Gleicher of Rattigan in response to Rattigan's  October 3, 2001 communication to UC Gleicher, SC Pyszczymuka and DAD Kaciban expressing several pressing needs of LEGAT Riyadh, including the need to address a significant security issue, in an attempt to discredit and undermine his leadership of the Riyadh office and to create a

7

justification for removing the plaintiff from the position of LEGAT Riyadh;

j.      the use of temporary duty personnel to Riyadh, ostensibly to assist the office, but often to surreptitiously investigate plaintiff, which had the intended effect of undermining plaintiff's supervisory authority;

k.      interrogating returning temporary duty personnel, such as SA Beth Baybak, returning from assignments in Riyadh with the goal of obtaining derogatory or negative information about plaintiff and undermining his supervisory authority, a process Baybak later described as an attempt to coerce her into making derogatory statements against the Plaintiff;

l.      statements by temporary duty personnel returning from Riyadh, such as the statement given by SA Leroy Dempsey, Jr., on April 9, 2003, that, based on what he observed in Riyadh, it appeared that the plaintiff was the victim of racial discrimination by the Bureau.

m.     the decision by senior FBI personnel, such as DAD Kaciban, UC Gleicher, and SC Pyszczymuka, that they were no longer communicated directly with the plaintiff in the performance of his duties;

n.      the sending of a team of temporary duty personnel to the United Arab Emirates ("UAE") relative to the 9/11 investigation, who reported directly and exclusively to FBI HQ and not to Riyadh, even though the UAE was within the plaintiff's territorial responsibilities

o.      the unilateral, last minute cancellation of a trip planned by Rattigan to the UAE to address outstanding leads relating to the 9/11 investigation by UC Pyszczymuka, without any prior discussion or imput from the plaintiff;

p.      the failure of the Bureau to promptly transfer temporary duty personnel to LEGAT Riyadh to assist the 9/11 investigation, although other less critical LEGAT offices, headed by white agents, were not subjected to this unreasonable delay in the assignment of temporary duty personnel;

q.      the failure to authorize the use of or immediately dispatch qualified translators for the Riyadh Office, even though such personnel were provided to other LEGAT offices which were headed by white FBI agents; ;

r.      the exclusion of Rattigan from the annual LEGAT conference held in Washington, D.C., in October, 2002, because he was ordered to attend an FBI supervisor's management seminar;

s.      the assignment of Rattigan to London for "hands-on" LEGAT training as a pretext to get him out of the Riyadh office so that the FBI could conduct another unfounded investigation of his management of the Riyadh office;

t.      the cancellation of plaintiff's home leave in the U.S. in August, 2002, and the ordering of the plaintiff back to Riyadh for the purpose of still another investigation of the office, this time by UC Sandy Fowler ("Fowler"), which included the improper destruction of files relating to the September 11, 2001 investigation, causing inordinate delay in the exchange of information between the LEGAT Riyadh and the Saudi counterparts, and extreme embarrassment for the plaintiff;

u.      the deletion by UC Fowler of the the contents of the plaintiff's Bureau e-mail account after he had indicated to his superiors at FBIHQ that he had e-mail evidence concerning his allegations of racism against them;

9

v.      even though UC Fowler was removed as Rattigan's Unit Chief, after he complained about her biased treatment of him, the investigation that she conducted was the basis for yet another investigation in November, 2002 by a team of FBI agents, including, Charles Goodwin, Special Assistant to the Assistant Director; Nathan Gray, Assistant Special Agent in Charge; and, Eduardo Sanchez, LEGAT Madrid;

w.      the removal of Rattigan as the person in charge of LEGAT Riyadh by Charles Goodwin in November, 2002, in favor of LEGAT Sanchez;

x.      retaliation against Rattigan by EAD Pasquale D'Amuro for Rattigan's complaints to Director Mueller about unauthorized travel of FBI personnel to the Arabian Peninsula, as well as the failure to advise of meetings, and the results thereof, between Saudi officials and D'Amuro, that ultimately resulted in extreme embarrassment and humiliation for the plaintiff with his Saudi counterparts in Riyadh.

y.      the passing of investigative requests by D'Amuro directly to Saudi embassy officials in Washington, D.C. without prior or post notification to the plaintiff, in violation of Bureau rules and regulations;

z.      e-mails in January, 2003, from SSA Robert Jones, of the Bureau's Counter Terrorism Division ("CTD"), which falsely and maliciously indicated that the FBI should not expect any assistance from the plaintiff because he was working for the Saudi Government, in effect accusing the plaintiff of being disloyal to the U.S. government and suggesting it would be futile to seek his assistance;

aa.     the failure of FBI supervisory personnel, including EAD D'Amuro and SAC

Beverly, to investigate Jones' comments, after being requested to do so by the plaintiff;

bb.    the investigation of plaintiff's loyalty solely because he advised the Bureau, on or about January 28, 2002, that he had converted to Islam, which included questioning of associates of Rattigan, which one, OA Diane Edge, described as a "witch-hunt or fishing expedition";

cc.    the cancellation on February 8, 2003, approximately two hours before the plaintiff's departure from Riyadh to Mecca, of plaintiff's planned trip to perform the religious ceremony known as the Hajj;

dd.    the reaction to plaintiff's conversion to Islam was intended to and did have the effect of propagating the perception that plaintiff was disloyal because of his conversion, as reflected in the sworn statement dated May 30, 2003, by Timothy M. Stone, former Liaison Analyst, OIO, that he "had heard people talk about SSA Rattigan's religion," and that "throughout the counterterrorism division (which was headed by EAD D'Amuro) there was a general rumor regarding SSA Rattigan's loyalty to the United States versus the Saudi Arabian Government";

ee.    the statement by Bureau personnel in an article in the October 20, 2003 edition of the *Newsweek* magazine, page 6, entitled "Tensions in the FBI:  Why Was This Agent Fired?", which reported that "a top FBI official" in Washington complained when the plaintiff and Gamal previously went to Mecca and that the Bureau became nervous and recalled the plaintiff from Riyadh to New York because of 'administrative' reasons.

ff.    the rescission of Rattigan's extension of duty in Riyadh and his demotion on

December 3, 2002 by FBI Director Mueller following his discussions with
Deputy Director Bruce Gebhardt, SAC Beverly and others, which was taken in
violation of several existing Bureau policies based on the pretext that his
performance did not meet expectations;

gg.     the threat by UC Curtis that unless he selected a position from several job
vacancies which were presented to him by UC Curtis he would end up in a Grade
13 position somewhere else;

hh.     the fact that subsequent to his removal from LEGAT Riyadh, the FBI upgraded
the position of LEGAT Riyadh to a Senior Executive Service position, reduced
the size of the territory, and increased the permanent staff assigned to Riyadh, all
changes that Rattigan and acting LEGAT Sanchez had been requesting, but never
received during their tenure as LEGAT Riyadh;

ii.     the replacing of Rattigan with an agent, a white male, who had no terrorism
experience, no overseas experience, and no LEGAT experience prior to his
selection, all of which suggests strongly that Rattigan was demoted for reasons
having nothing to do with his ability and everything to do with his race, national
origin and religion;

jj.     the fact that even after his transfer back to New York, the FBI has continued to
retaliate against the plaintiff.

22.     Similar conduct, including, *inter alia*, harassment, undermining of supervisory
authority, excluding the plaintiff from FBI activities in the area covered by his office, multiple
bad faith investigations and inspections, bad faith loyalty investigations, false accusations of
misconduct, withholding of necessary support services, denial of right to engage in religious

practices and demotions have not been directed by the defendant at white FBI agents assigned as LEGATs at other LEGAT offices around the world.

23.     Defendant's purpose in engaging in this conduct during the period of time that Rattigan served as LEGAT in Riyadh, Saudi Arabia, was to interfere substantially with plaintiff's work performance and the effect of this conduct was to create an intimidating, hostile and offensive work environment, as described above.

24.     The hostile and offensive treatment of Rattigan while he was LEGAT Riyadh was known at the highest levels within the defendant FBI, including Director Mueller. Notwithstanding numerous complaints that plaintiff made to his supervisors and to Director Mueller, no investigation of this conduct was ever undertaken by the FBI and no one was ever punished or disciplined for having engaged in such hostile and offensive conduct.  As a result of defendant's actions, including the failure to adequately address the conduct of Rattigan's supervisors after their offensive conduct was brought to the attention of the Bureau at the highest levels, the plaintiff was subjected to a workplace permeated with discrimination and harassing behavior, intimidation and insult based on race, national origin and/or religion, which was sufficiently severe and pervasive to alter the terms and conditions of his employment.

25.     The decision to demote the plaintiff from the position of LEGAT Riyadh to a supervisor in the New York Field Office of the FBI was a personnel decision or action as that term is understood in the FBI.  (See Exhibit A to the Second Amended Complaint).  It became effective, pursuant to FBI regulations, see FBI Manual of Administrative Operations and Procedures, Part 2, 6-2(2), on the date that the plaintiff reported to his new assignment.  The plaintiff's first contact with EEO officials of the FBI alleging discrimination based on race, religion and national origin as it related to this demotion was made shortly after he reported for

13

duty in the New York Field Office.  As a result, the plaintiff timely challenged the personnel decision.

26.     The actions of the defendant as described above, acting through the above named individuals, were motivated, in part, by the fact that OIO management did not want plaintiff, a black male and a naturalized U.S. citizen of Jamaican descent, to succeed in the Bureau, particularly since plaintiff was actively involved in the most important investigation conducted by the Bureau.  This motivation reflects the ongoing legacy of racial discrimination that has roiled the Bureau in the past 10 to 15 years.

27.     The actions of the defendant as described above, acting through the above named individuals, were further motivated by animus toward plaintiff because of his conversion to Islam and the practice of his faith.

28.     The actions of the defendant as described above created and were intended to create a hostile work environment for the plaintiff.  The acts complained of occurred over a discrete period of time, during the period the plaintiff served as ALAT and subsequently as LEGAT Riyadh.  The acts complained of were the work of a small group of supervisory personnel, who remained in a position of power over the plaintiff throughout his tenure in Riyadh.  The acts complained of were inter-related; they were not isolated acts which have no relation to each other.  Even though some of the actions of the defendant were not the explicit subject of an administrative complaint, they are so inter-related that they are actionable as part of the hostile work environment which the plaintiff was subjected to by the defendant.

29.     The actions of the defendant were frequent and on-going.  They included physical threats, threats to the plaintiff's livelihood, outrageous suggestions that the plaintiff was disloyal to his country, and they were humiliating and degrading.

14

30.     The actions of the defendant interfered with the plaintiff's work performance in that he was constantly having to deal with matters other than the investigative and law enforcement work that as a member of the FBI he was expected to do.  As a result of the conduct of the defendant, the plaintiff felt ostracized from his fellow agents and he suffered mental distress and anguish as a direct and proximate result thereof.

31.     The actions of the defendant as described above, acting through the above named individuals, constituted retaliation for the plaintiff having complained that he was being discriminated against.

32.     Following the filing of his internal complaint on May 6, 2002, and subsequent complaints that he has filed, the plaintiff was subjected to continual harassment and retaliation for having complained about how he was treated, leading up to his eventual transfer out of Riyadh and demotion in rank.  In addition, plaintiff has been subjected to harassment and discrimination in the terms and conditions of his employment based the fact that he converted to the Islamic religion in December, 2001.

33.     As a direct and proximate result of the conduct of FBI supervisory officials toward him, plaintiff has been injured, including mental pain and suffering, embarrassment, humiliation, degradation, the denial of promotional opportunities, and involuntary re-assignment and demotion in grade

**FIRST CLAIM**
**(Hostile Work Environment)**

34.     The Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 33 as if fully set forth herein.

35.     The conduct and actions of the defendant as described above against the plaintiff,

some of which were timely exhausted through appropriate administrative proceedings (see

Exhibit B to the Second Amended Complaint) created a hostile work environment based on

plaintiff's race, national origin and/or religion, was done intentionally, maliciously and/or with a

reckless disregard for the natural and probable consequences of its acts, was done without lawful

justification and was designed to and did cause specific and serious injury, mental pain and

suffering, in violation of the Plaintiff's rights under 42 U.S.C. §2000e et seq.

## SECOND CLAIM
### (Demotion)

36.     The Plaintiff incorporates by reference the allegations set forth in Paragraphs 1

through 35 as if fully set forth herein.

37.     The personnel decision by the defendant to demote the plaintiff and re-assign him

from Riyadh to New York, which was effective when he reported to New York in July, 2003, in

addition to being part of the hostile work environment, was itself a discrete and cognizable act of

discrimination based on plaintiff's race, national origin and/or religion, was properly exhausted

administratively within the FBI, (see Exhibit C to the Second Amended Complaint), was an

adverse employment or personnel decision, and was done intentionally, maliciously and/or with

a reckless disregard for the natural and probable consequences of its acts, was done without

lawful justification and was designed to and did cause specific and serious injury, including

mental pain and suffering, in violation of the Plaintiff's rights under 42 U.S.C. §2000e et seq.

## THIRD CLAIM
### (Retaliation)

38.     The plaintiff incorporates by reference the allegations set forth in Paragraphs 1

through 37 as if fully set forth herein.

39.     The conduct and actions of the defendant as described above in subjecting the

16

plaintiff to discrimination based on his race, national origin and/or religion was done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of its acts, was done without lawful justification and, in addition to being part of the hostile work environment, was done in retaliation for the plaintiff having complained about discriminatory treatment, were timely exhausted through proper administrative procedures, (see Exhibit B to the Second Amended Complaint), and was designed to and did cause specific and serious injury, including mental pain and suffering, in violation of the Plaintiff's rights under 42 U.S.C. §2000e et seq.

### THIRD CLAIM
### (Retaliation)

40.     The plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 39 as if fully set forth herein.

41.     The conduct and actions of the defendant, including, *inter alia*, the failure to include him in meetings, the refusal to permit him to continue to study Arabic, the unauthorized file review conducted by SSA Finch, the repeated and persistent failures of the Bureau to respond to PENTTBOMB requests for assistance, the on-site file review by UC Cary Gleicher, the refusal of SC Pyszczmuka to permit the plaintiff to travel to the UAE, the repeated and persistent debriefing of personnel returning from Riyadh in order to develop derogatory information on the plaintiff and to undermine his supervisory authority, the channeling of all oral communications from the plaintiff to his supervisors through DAD Kaciban, the unauthorized travel of personnel to the Arabian peninsula, the lack of notice given to the plaintiff about the trip of SSA Abdel-Hafiz to FBI HQ, the bad faith Security Investigation of plaintiff because of his conversion to Islam, constituted adverse employment or personnel decisions, were timely

17

exhausted within the agency, were based on the race, national origin and/or religion of the plaintiff, were done intentionally, maliciously and/or with a reckless disregard for the natural and probable consequences of its acts, were done without lawful justification and were designed to and did cause specific and serious injury, including mental pain and suffering, in violation of the Plaintiff's rights under 42 U.S.C. §2000e et seq.

**WHEREFORE,** the plaintiff demands the following relief jointly and severally against the defendant:

A.  Compensatory damages for the plaintiff in an amount to be determined by the jury or the finder of fact, including, but not limited to, back pay, front pay, lost pension benefits and retirement benefits, and the value of other lost benefits, mental anguish, pain and suffering, embarrassment and humiliation;

B.  Punitive damages in an amount to be determined;

C.  The convening and impaneling of a jury to consider the merits of the claims herein;

D.  Attorney's fees and the costs of this action;

E.  Such other and further relief as this court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

DATED:      September 9, 2006
            New York, New York

                              Respectfully submitted,

                                 /S/
                              _____
                              JONATHAN C. MOORE, Esq.
                              (JM-6902)

18

BELDOCK, LEVINE & HOFFMAN, LLP
99 Park Avenue - Suite 1600
New York, New York   10016
(212) 490-0400

JAMES R. KLIMASKI, Esq.
(D.C. Bar No. 243543)

KLIMASKI & ASSOCIATES, P.C.
1819 L Street, N.W. - 7th Floor
Washington, D.C.   20036
(202) 296-5600

*Attorneys for the Plaintiff*

19