## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)

**WILFRED SAMUEL RATTIGAN,**                 )

)

     **Plaintiff,**                 )

)

   **v.**                 )  **Civil Action No. 04-2009 (ESH)**

)

**ALBERTO R. GONZALES,**                 )

**Attorney General of the United States,**                 )

)

     **Defendant.**                 )

_____ )

### <u>MEMORANDUM OPINION</u>

   Plaintiff Wilfred Rattigan, an attorney, has been employed in various positions within the Federal Bureau of Investigation ("FBI") since 1987.  (2d Am. Compl. ¶¶ 9, 11.)  The crux of this case, however, relates to his tenure as an assistant legal attaché ("ALAT") and then as legal attaché ("LEGAT") at the FBI's office in Riyadh, Saudi Arabia from 1999 to 2003.  (*See id.* ¶¶ 15, 19, 37.)  Plaintiff contends that his employer discriminated against him and subjected him to a hostile work environment because of his race, religion, and/or national origin and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. § 2000e *et seq.*  Before the Court is defendant's motion to dismiss, or in the alternative, for summary judgment.  For the reasons set forth below, defendant's motion to dismiss will be granted in part and denied in part, and the motion for summary judgment will be denied without prejudice.

## BACKGROUND

### I.       Factual History

Plaintiff is an African American of Jamaican descent.  (2d Am. Compl. ¶ 9.)  He

converted to Islam in December 2001 while working as the LEGAT in Riyadh.  (*Id.* ¶¶ 21(bb),

32.)  At the time, the Riyadh legal attaché office had a permanent staff of three -- a LEGAT, an

ALAT, and an office assistant -- but other FBI personnel were assigned to Riyadh on temporary

duty from time to time.  (*See id.* ¶¶ 15, 21(j), 21(k).)  The office is responsible for interfacing

with law enforcement and security agencies on the Arabian peninsula to facilitate an exchange of

information between the FBI and the foreign agencies and to pursue the FBI's international

investigations.  (*Id.* ¶¶ 14, 16.)  By all accounts, plaintiff's relationship with his supervisors

while he was in Riyadh was contentious, though he was promoted from ALAT to LEGAT during

his time there.  (*Id.* ¶¶ 15, 19.)  Ultimately, plaintiff's request for an extension of duty in Riyadh

was denied in December 2002, and in July 2003, he began working as a supervisor in the FBI's

New York Field Office, where he is employed today.  (*Id.* ¶¶ 21(ff), 25, 37.)

As noted, plaintiff's complaint relates to his tenure in Saudi Arabia.  He began his career

there as the ALAT at the FBI's legal attaché office at the U.S. embassy in Riyadh.  (*Id.* ¶ 13.)

His immediate supervisor in Riyadh was Bassem Youssef, who served as the LEGAT in Saudi

Arabia at the time.  (*Id.*)  Plaintiff claims that from his arrival in February 1999 until the time

that Youssef left the Riyadh office in June 1999, Youssef and others discriminated against him

based on his race and/or national origin.  (*Id.* ¶ 17.)  Specifically, plaintiff alleges that Youssef

failed to inform him about "key events and developments," failed to involve him in "significant

meetings," and did not permit him to attend Arabic language classes on his own time, and that

supervisory personnel at FBI headquarters failed to respond to plaintiff's complaints about Youssef's conduct toward him.  (*Id.*)  Plaintiff also alleges that he was discriminated against by the initiation of an "unauthorized" review of his files conducted by Supervisory Special Agent Alfred Finch, which he claims "led to a false and misleading performance report being submitted to the Inspection Division of the FBI."  (*Id.* ¶¶ 17, 41.)  According to plaintiff, the discriminatory nature of these actions is demonstrated by the fact that white FBI agents in plaintiff's position, including plaintiff's predecessor in Riyadh, "were not treated in the same manner."  (*Id.* ¶ 18.)  Plaintiff claims that Youssef's conduct toward him caused him severe embarrassment and created a perception in the U.S. embassy community that plaintiff was incompetent.  (*Id.*)  Notwithstanding these events, however, plaintiff was promoted to the position of LEGAT Riyadh in July 2000, a position that he held until his move to New York in 2003.  (*Id.* ¶¶ 19, 37.)

Plaintiff continued to have a troubled relationship with his FBI supervisors after his promotion to LEGAT for Riyadh.  He claims that he was denied support and resources that white LEGATs in other offices in other parts of the world were receiving post-9/11, that he was subjected to multiple "bad faith" investigations and falsely accused of misconduct and disloyalty, and that his authority as LEGAT Riyadh was undermined because he was excluded from various FBI activities on the Arabian peninsula.  (*Id.* ¶ 22.)  Plaintiff alleges that the FBI failed to provide him with adequate resources -- including permanent and temporary staff and translators -- to handle the increased workload in the Riyadh office and provided him with fewer resources than white LEGATs "were typically provided with."  (*Id.* ¶¶ 21(a), (b), (f), (h), (p), (q).)  He claims that though he had requested these additional resources throughout his time in Riyadh, only after his move to the New York office did the FBI reduce the size of the territory

that the Riyadh office was responsible for and increase the permanent staff in the office.  (*Id.*
¶ 21(hh).)  Plaintiff also alleges that he was the target of various internal investigations, and that
these investigations were initiated in bad faith in an attempt to undermine his leadership and cast
doubt on his loyalty to the FBI.  Specifically, in October 2001, Unit Chief Cary Gleicher
conducted an investigation of the Riyadh office; in or around April 2002, the FBI's security
division conducted a "loyalty" investigation of plaintiff after learning in January 2002 that he
had converted to Islam; in August 2002, Unit Chief Sandy Fowler conducted another
investigation of the Riyadh office, during which time the contents of plaintiff's FBI e-mail
account were allegedly deleted; and finally in November 2002, a different team of FBI agents
conducted yet another investigation.  (*Id.* ¶¶ 21(i), (t), (u), (v), (bb); *see* Pl.'s Opp'n at 39.)  In
addition, plaintiff claims that temporary duty personnel returning from Riyadh were interrogated
by FBI officials in an attempt to gather derogatory information about plaintiff.  (2d Am. Compl.
¶¶ 21(j), (k).)  Plaintiff further alleges that he was excluded from certain meetings, that an
investigative trip he had planned to the United Arab Emirates ("U.A.E.") was "unilaterally
cancelled," that his supervisors decided to cut off direct communication with plaintiff and/or
"channeled" all their communications with him through Deputy Assistant Director Leslie
Kaciban, and that his supervisors "bypassed" him in conducting certain activities on the Arabian
peninsula for which plaintiff should have been responsible.  (*Id.* ¶¶ 41, 21(e), (m), (n), (o), (r),
(x), (y).)

Plaintiff further alleges that he was the subject of several discriminatory comments or
threats.  In January 2001, Kaciban allegedly told plaintiff, "If I catch you doing something . . . I
promise you I'll cut your balls off."  (*Id.* ¶ 21(c).)  Plaintiff argues that this "threat to castrate"

him carried a racially "charged" meaning.  (Pl.'s Opp'n at 24, 28.)  Then, on September 30,

2001, at a meeting in Washington, at which plaintiff was not present, where the role of the

Riyadh office in the investigation of the terrorist attacks of September 11 was discussed,

Kaciban allegedly stated: "Let's see how much [plaintiff's] Arab brothers are going to help him

on this one."  (2d Am. Compl. ¶ 21(g).)  Finally, in January 2003, Supervisory Special Agent

Robert Jones allegedly wrote e-mails stating that the FBI should not expect any assistance from

plaintiff because he was working for the Saudi government.  (*Id.* ¶ 21(z).)  Plaintiff also alleges

that he was denied the right "to engage in religious practices" when permission for his planned

trip to Mecca in February 2003 for the Hajj, a Muslim religious ceremony, was denied at the last

minute by his supervisors.  (*Id.* ¶¶ 22, 21(cc).)

        In December 2002, plaintiff's request for an extension of his tour as LEGAT for Riyadh

was denied.  (*Id.* ¶ 21(ff).)  Plaintiff subsequently assumed his current position as a supervisor in

the New York field office, but he claims that he was "threatened" by Unit Chief Susan Curtis

that if he did not select a position from several alternatives that were presented to him, he would

end up in a lower-grade position.  (*Id.* ¶¶ 21(jj), 21(gg), 25.)  He left Riyadh and began his new

assignment in July 2003.  (*See* Pl.'s Opp'n at 32.)  He alleges that he was replaced as LEGAT in

Riyadh by a white male agent with "no terrorism experience, no overseas experience, and no

LEGAT experience prior to his selection."  (2d Am. Compl. ¶ 21(ii).)  Plaintiff does not allege

that his new position in New York was at a lower pay grade than his Riyadh position, but he

characterizes the reassignment as a demotion because after he left Riyadh, the FBI "upgraded"

the LEGAT Riyadh position to a "Senior Executive Service position."  (*Id.* at 21(hh); Pl.'s

Opp'n at 16-17.)

Plaintiff claims that throughout his tenure as LEGAT in Riyadh, a "set of management personnel" -- including FBI Director Robert Mueller, Deputy Assistant Director Kaciban, Special Agent in Charge Roderick Beverly, Section Chief Michael Pyszczymuka, Unit Chief Gleicher, Unit Chief Curtis, Unit Chief Fowler, and Executive Assistant Director Pasquale D'Amuro -- undertook various discrete acts of discrimination and subjected him to a hostile work environment "based on his race, national origin and religion," and that they retaliated against him for reporting this discrimination.  (*Id.* ¶ 20.)  Plaintiff's complaint lists a litany of thirty-six acts, including those discussed above, that he claims constituted a hostile work environment.  Plaintiff also contends that he was subject to twelve discrete acts of discrimination and eleven discrete acts of retaliation.  His complaint identifies the following as discrete acts of discrimination:[1]

1.      The failure of LEGAT Youssef to include him in meetings;

2.      Youssef's refusal to permit him to continue to study Arabic;

3.      The file review conducted by Finch;

4.      The "repeated and persistent failures" of the FBI to respond to his requests for assistance after September 11, 2001;

5.      The on-site review conducted by Gleicher in October 2001;

6.      The "repeated and persistent" debriefing of personnel returning from Riyadh "in order to develop derogatory information" about plaintiff and to "undermine" his authority;

7.      The denial of permission for plaintiff to travel to the U.A.E.;

---

[1]Plaintiff's complaint lists these acts under the heading "Third Claim (Retaliation)." However, correspondence from plaintiff's counsel to defense counsel clarifies that plaintiff intended this heading to read "Fourth Count (Discrimination)."  (*See* Def.'s Mot. at 20 n.3.)

8.    The "channeling" of all oral communications from the plaintiff to his supervisors through Kaciban;

9.    "Unauthorized travel" of personnel to the Arabian peninsula;[2]

10.   The lack of notice given to plaintiff about the trip of Gamal Abdel-Hafiz to FBI Headquarters;[3]

11.   The "bad faith" investigation of plaintiff conducted by the FBI's security division "because of his conversion to Islam;" and

12.   His "demotion" and reassignment from Riyadh to New York.

(*Id.* ¶¶ 41, 37; Pl.'s Opp'n at 36.)  The complaint alleges that these same discrete acts of discrimination (except for the demotion and reassignment) also constituted acts of retaliation. (2d Am. Compl. ¶¶ 38, 39.)[4]

## II.    Procedural History

Plaintiff's Second Amended Complaint lists his first contact with an Equal Employment Opportunity ("EEO") counselor as October 26, 2001.  (*Id.* ¶ 6.)  However, his opposition to the instant motion and the exhibits submitted by defendant indicate that plaintiff first contacted an EEO counselor, Ivonne Virtue, in January 2000 to lodge a complaint against Youssef for "racial discrimination."  (*See* Pl.'s Opp'n  at 2, 37; Def. Ex. G at 1.))  Virtue directed plaintiff to the

---

[2]Plaintiff's complaint is far from a model of clarity, but this allegation appears to refer to plaintiff's claim that he was improperly kept out of the loop regarding the travel of certain FBI personnel to the Arabian peninsula.  (*See* 2d Am. Compl. ¶ 21(x).)

[3]The Second Amended Complaint offers no additional detail about this allegation, but plaintiff's First Amended Complaint indicates that Gamal Abdel-Hafiz was the ALAT serving under plaintiff and alleges that he was summoned to FBI Headquarters in June 2002 without plaintiff's knowledge to "discuss the status of LEGAT Riyadh."  (1st Am. Compl. ¶¶ 46, 123.)

[4]Plaintiff's counsel has confirmed that paragraph 38 of the complaint that refers to allegations set forth "above" should refer to the allegations set forth "below" in the complaint's count for discrimination.  (*See* Def.'s Mot. at 20 n.3.)

FBI's Employee Assistance Program in an attempt to resolve his grievance.  (Pl.'s Opp'n  at 2.)
On June 13, 2000, plaintiff sent a memorandum to Virtue referring to their January contact and
complaining that Finch had conducted his file review in May 2000 in retaliation for plaintiff's
complaint to Virtue about Youssef's behavior.  (Def. Ex. G at 1.)  Plaintiff did not file an EEO
complaint regarding any of these allegations at the time.

On May 6, 2002, plaintiff filed a complaint with the FBI's EEO office alleging a hostile
work environment and discrimination based on his race and national origin.  (2d Am. Compl.
¶ 6; Def. Ex. O at 1.)  He listed his first contact with an EEO official as October 26, 2001.  (2d
Am. Compl. ¶ 6.)  This EEO complaint accused plaintiff's supervisors -- Kaciban, Gleicher, and
Section Chief Michael Pyszczymuka -- of engaging in a "pattern of discriminatory treatment."
(Def. Ex. O at 3.)  Specifically, plaintiff complained about insufficient responses to his requests
for resources, the debriefing of temporary personnel who had been in Riyadh to gather
intelligence about plaintiff, the on-site investigation by Gleicher of the Riyadh office in October
2001, the denial of plaintiff's request to travel to the U.A.E., and the comment allegedly made by
Kaciban in October 2001 about plaintiff's "Arab brothers." (Def. Ex. O at 4, 6-9.)  Plaintiff did
not check the box on the EEO complaint form for "Reprisal," but the text of the complaint refers
to Kaciban's "desire to exact revenge" for plaintiff's reporting of a racist remark (*i.e.*, the
comment about "cut[ting] off your balls") in January 2001.  (*Id.* at 9.)

On July 8, 2002, plaintiff e-mailed an EEO officer requesting leave to amend his May 6,
2002 complaint to include the allegation that Kaciban, Pyszczymuka, and Gleicher had "engaged
in retaliatory action" against him for his "attempt to seek administrative relief via the EEO
process" by (1) causing the FBI's security division to conduct a "massive investigation against"

him that focused on, *inter alia*, his religion, his loyalty to the FBI, and his alleged hosting of "wild parties" and procuring of prostitutes for temporary FBI personnel; and by (2) failing to inform him of ALAT Gamal Abdel-Hafiz's trip to FBI headquarters for interviews regarding LEGAT Riyadh. (2d Am. Compl. ¶ 6; Def. Ex. GG at 1.) By letter dated August 6, 2002, the FBI's EEO office accepted for investigation plaintiff's allegations about the FBI's failure to supply adequate support, the comment about plaintiff's "Arab brothers," and the retaliatory investigation by the security division. (2d Am. Compl. ¶ 6; 2d Am. Compl. Ex. 2.)

On March 16, 2004, plaintiff filed a second EEO complaint based on an initial contact with the FBI's EEO office on July 21, 2003. (2d Am. Compl. ¶ 8.) The March 16 complaint alleged discrimination based on race, national origin, religion, and retaliation with respect to the denial of his request for an extension of his tour in Riyadh in December 2002; the administrative review of his office conducted by Fowler in August 2002; the FBI's request that he attend a "basic supervisor's course" at FBI headquarters in November 2002; the on-site review of the Riyadh office in November 2002; a *Newsweek* magazine article from October 2003 that indicated that the FBI had concerns about plaintiff's conversion to Islam; and the increase in personnel resources assigned to Riyadh after plaintiff's departure. (2d Am. Compl. ¶ 8; Def. Ex. II.) Plaintiff filed a third EEO complaint on November 5, 2004, alleging discrimination and retaliation relating to his five-year security clearance reinvestigation. (2d Am. Compl. ¶ 8; Def. Ex. KKK.) Plaintiff filed this lawsuit on August 19, 2004, after an Administrative Law Judge issued an order granting plaintiff the right to withdraw his first administrative charge to pursue his remedies in court. (2d Am. Compl. ¶ 7.) The plaintiff was advised by the FBI's EEO office that because of the pendency of this suit, no further administrative action would be taken on his

second or third complaints.  (*Id.* ¶ 8.)

On August 1, 2006, the Court heard arguments on defendant's first motion to dismiss. Defendant moved to dismiss a number of plaintiff's discrimination and retaliation claims on the grounds that plaintiff had failed to exhaust his administrative remedies for those claims, as required by Title VII.  (Def.'s 1st Mot. to Dismiss, Mar. 29, 2006 [Dkt. 25], at 21-22.)  By Order dated August 2, 2006, the Court granted defendant's motion to dismiss "with respect to all discrete discriminatory or retaliatory acts that were not exhausted in a timely fashion or were not included in plaintiff's administrative complaints, including but not limited to the denial of his request to extend his stay in Saudi Arabia that occurred on December 2, 2002." *Rattigan v. Gonzales*, Civ. No. 04-2009, Order at 1 (Aug. 2, 2006).  The Court also granted plaintiff leave to amend his complaint to clarify his claims to include a count for hostile work environment, but it directed that any amended complaint would have to specify the discrete acts of discrimination and retaliation so that the issue of exhaustion could be resolved and also would have to clearly identify the bases for his hostile work environment claim.  (*See* 1st Mot. to Dismiss Hr'g Tr. at 30-31, 34 (Aug. 1, 2006).)

Plaintiff filed his second amended complaint on September 9, 2006, and defendant subsequently filed the instant motion.  Defendant has moved to dismiss all claims, or in the alternative for summary judgment, arguing that plaintiff has not exhausted his administrative remedies with respect to eight of the twelve acts of discrimination and that none of the specific acts of discrimination constituted an adverse personnel action; that plaintiff did not exhaust his administrative remedies with respect to seven of the eleven acts of retaliation, that a causal connection does not exist between the alleged acts of retaliation and any protected activity, and

that none of these acts are adverse actions within the meaning of *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006).  Defendant also argues that plaintiff's complaint does not, as a matter of law, establish a hostile work environment claim.  In response, plaintiff asks the Court to reconsider its dismissal of plaintiff's claims regarding his transfer from Riyadh to New York, and he argues that he has properly exhausted his administrative remedies for all of his claims and that his complaint properly states claims for discrimination, retaliation, and hostile work environment based on race, national origin and/or religion under Title VII.  Plaintiff also requests additional discovery under Fed. R. Civ. P. 56(f).  (Pl.'s Opp'n. at 5 n.1.)

## ANALYSIS

### I.     Legal Standard

As the Supreme Court recently held in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (May 21, 2007), a complaint must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face."[5]  *Id.* at 1974 (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  The allegations in plaintiff's complaint are presumed true at this stage and all reasonable factual inferences must be construed in plaintiff's favor.  *Maljack Prods., Inc. v. Motion Picture Ass'n of*

---

[5]As discussed herein, the majority of plaintiff's claims will be dismissed, but plaintiff is entitled to additional discovery on certain retaliation claims under Fed. R. Civ. P. 56(f). Accordingly, the Court will treat this motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and it will confine its analysis "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference," including the EEO administrative complaints which have been appended to defendant's pleadings, "and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citations omitted).

*Am., Inc.*, 52 F.3d 373, 375 (D.C. Cir. 1995). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl.*, 127 S. Ct. at 1965.

## II.      Exhaustion of Title VII Claims

Defendant moves to dismiss many of plaintiff's discrimination and retaliation claims on the theory that he failed to exhaust administrative remedies before bringing suit. (Def.'s Mot. at 25, 34.) Lodging a timely administrative charge is a prerequisite to filing a Title VII claim in federal court. *See Jarrell v. U.S. Postal Serv.*, 753 F. 2d 1088, 1091 (D.C. Cir. 1985). An employee of the federal government complaining of discrimination must consult an EEO counselor within forty-five days of the allegedly discriminatory action, or in the case of a personnel action, within forty-five days of its effective date, in order to try to informally resolve the matter. 29 C.F.R. § 1614.105(a)(1). If the matter is not resolved informally, the employee may then file a formal complaint of discrimination against the agency, following which the agency is obligated to investigate the matter within 180 days. *Robinson v. Chao*, 403 F. Supp. 2d 24, 28 (D.D.C. 2005); *see* 29 C.F.R. §§ 1614.105(d), 108(e). After the conclusion of the agency's investigation, the employee may either request a hearing and decision from an administrative law judge or seek an immediate final decision from the agency. *Robinson*, 403 F. Supp. 2d at 28; *see* 29 C.F.R. § 1614.108(f). A complainant may either appeal a decision to the Equal Employment Opportunity Commission ("EEOC") or file a civil action in federal district

court, where he can challenge only those allegations that were contained in an EEO complaint, or those that are "like or reasonably related to the allegations of the charge and grow[] out of such allegations." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995); 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407.  The Title VII exhaustion requirement also "precludes recovery for discrete acts of discrimination or retaliation that occur outside of the statutory time period" even when the acts "are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 113 (2002).

These procedural requirements governing plaintiff's right to bring a Title VII claim in federal court are not trivial.  "[I]t is part and parcel of the Congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel 'primary responsibility' for maintaining non-discrimination in employment." *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir. 1983) (citations omitted).  "Exhaustion is required in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary." *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).  The deadlines allow an employer to investigate promptly before evidence becomes stale. *See Ricks*, 449 U.S. at 256-57 (noting that the Title VII exhaustion requirement protects employers from the burden of defending claims that arise from decisions that were made long ago).  Dismissal results when a plaintiff fails to exhaust administrative remedies. *See Gillet v. King*, 931 F. Supp. 9, 12-13 (D.D.C. 1996) (dismissing the plaintiff's Title VII claim because he failed to exhaust his administrative remedies).  But failure to exhaust is an affirmative defense, and the burden rests with the defendant. *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *Marsh*, 777 F.2d at 13.

Presuming the truth of the allegations in plaintiff's complaint and drawing all reasonable inferences in his favor, the Court concludes that plaintiff has failed to timely exhaust his administrative remedies for five of the discrete acts of discrimination and four of the discrete acts of retaliation.

First, plaintiff's discrimination and retaliation claims based on LEGAT Youssef's alleged failure to include him in meetings and refusal to permit him to continue studying Arabic were not raised with an EEO counselor within forty-five days. By plaintiff's own account, "his first contact ever within the FBI with an EEO counselor," Ivonne Virtue, was in late January 2000, at which time he complained of "racial discrimination suffered at the hands of . . . Youssef." (*See* Pl.'s Opp'n at 2, 37; Def. Ex. G at 1.) But plaintiff's complaint states that Youssef left his post as LEGAT Riyadh in June 1999. (2d Am. Compl. ¶ 17.) Plaintiff's January 2000 EEO contact, which occurred over six months after Youssef's departure, was simply too late to satisfy the time limits for exhaustion of any claims regarding Youssef's conduct while serving as plaintiff's supervisor. Moreover, even if plaintiff's first contact with the EEO officer had been timely, he did not participate in EEO counseling, nor did he file an administrative complaint based on these events. (*See* Pl.'s Opp'n at 2, 37.) Accordingly, plaintiff's discrimination and retaliation claims relating to Youssef's conduct are dismissed.

Plaintiff has also failed to exhaust administrative remedies for his discrimination and retaliation claims based on the "channeling" of oral communications between plaintiff and his supervisors through Kaciban and the "unauthorized travel" of personnel to the Arabian peninsula. A Title VII plaintiff may challenge only those allegations that were contained in an EEO complaint or are "like or reasonably related to the allegations of the charge and grow[] out

of such allegations.  *Park*, 71 F.3d at 907.  Neither of these acts was mentioned in any of

plaintiff's EEO administrative complaints or amendments, and neither was reasonably related to

any of the allegations in the complaints such that they are within the scope of "the administrative

investigation that can reasonably be expected to follow" plaintiff's EEO complaints.  *Id.*; *see*

*also Morgan*, 536 U.S. at 114 (holding that "[e]ach incident of discrimination and each

retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment

practice'" for which an administrative charge must be filed).  Plaintiff does not deny that these

acts were not included in any of his administrative complaints; instead, he argues that defendant

had previously admitted that these claims were timely filed.  An examination of defendant's first

motion to dismiss, however, contradicts this assertion.  (*See* Pl.'s Opp'n at 36-37; Def.'s 1st Mot.

to Dismiss [Dkt. #25] at 22.)  Therefore, these claims will be dismissed.

In its August 2, 2006 Order, the Court dismissed plaintiff's discrimination claim

regarding the denial of his request to extend his term as LEGAT in Riyadh for failure to exhaust.

Order at 1 (Aug. 2, 2006).  The Court held that the relevant discriminatory act, if any, for

plaintiff's claim was the denial of his request for an extension of his position in Riyadh, which

took place on December 2 or December 3, 2002, and that plaintiff did not timely exhaust his

administrative remedies with respect to this act.  (*Id.*)  Plaintiff now asks the Court to reconsider

this ruling, arguing, just as he did in opposition to the previous motion, that his transfer or

"demotion" -- as he characterizes it -- from Riyadh to New York was a single personnel action

that became effective on the day he reported for duty at his new position in New York on July

21, 2003.  (Pl.'s Opp'n at 32.)  Plaintiff cites an FBI policy to support his contention that "[t]he

effective date of a transfer is the date the employee reports for duty at the new official station."

(*Id.* at 34 (quoting FBI Manual of Operations and Procedures, Part 2, 6-2(2)).)  Plaintiff's first

EEO contact regarding his transfer out of Riyadh took place on the day he began his New York

position, and therefore, he claims that he properly exhausted this claim.  (*Id.* at 32.)

        Under Title VII, a federal employee complaining of discrimination must consult an EEO

counselor within forty-five days of the alleged discriminatory action, or in the case of a

personnel action, within forty-five days of its effective date.  29 C.F.R. § 1614.105(a)(1).  In

*Delaware State College v. Ricks*, 449 U.S. 250 (1980), the Supreme Court addressed the case of

a professor who claimed that the limitations period on his denial of tenure claim should run not

from the date of the denial, but from the date of the expiration of his contract.  *Id.* at 257.  Stating

that "the proper focus is upon the time of the discriminatory acts, not upon the time at which the

consequences of the acts bec[o]me most painful," the Supreme Court held that the professor's

subsequent "termination of employment . . . [was] a delayed, but inevitable, consequence of the

denial of tenure," but that the denial of tenure itself commenced the limitations period.  *Id.* at

257-58; *see also Chardon v. Fernandez*, 454 U.S. 6 (1981) (reaffirming the *Ricks* holding).  The

Court further remarked that "[m]ere continuity of employment, without more, is insufficient to

prolong the life of a cause of action for employment discrimination."  449 U.S. at 257.

        At the August 1 hearing on defendant's first motion to dismiss, this Court ruled that

denial of the plaintiff's request for an extension "was not a 'personnel action' within the

meaning of 29 C.F.R. § 1614.105(a)(1), but was a discriminatory act within the meaning of

[*Ricks* and *Chardon*], and, therefore, it had to be brought to the attention of an EEO counselor

within forty-five days of the act."  Order at 1 (Aug. 2, 2006).  Even if the effective date of

plaintiff's transfer to New York was on July 21, 2003, the discrimination, if any, occurred when

plaintiff's request to extend his tour as LEGAT Riyadh was denied in early December 2002.

(*See* 2d Am. Compl. ¶ 21(ff).)  And, although plaintiff's subsequent transfer to New York may

have been a consequence of the denial of his request to stay in Riyadh, it was not itself a

discriminatory personnel action.  *See Ricks*, 449 U.S. at 258 (holding that the limitations period

commenced at the time the tenure decision was made, "even though one of the effects of the

denial of tenure -- the eventual loss of a teaching position -- did not occur until later"); *Ledbetter*

*v. Goodyear Tire & Rubber Co.*, No. 05-1074, slip op. at 8 (May 29, 2007) ("The EEOC

charging period is triggered when a discrete unlawful practice takes place. A new violation does

not occur, and a new charging period does not commence, upon the occurrence of subsequent

nondiscriminatory acts that entail adverse effects resulting from the past discrimination.");

*Currier v. Radio Free Eur./Radio Liberty, Inc.*, 159 F.3d 1363, 1366 (D.C. Cir. 1998) (An EEO

complaint must be lodged within forty-five days of the "the *precise* unlawful employment

practice of which [plaintiff] complains." (quoting *Ricks*, 449 U.S. at 257) (internal quotation

marks omitted) (emphasis added)).

Based on this authority, it follows that the unlawful event was the denial of plaintiff's

request to stay in Riyadh, which occurred more than seven months prior to plaintiff's first EEO

contact.  Indeed, plaintiff's own complaint identifies December 3, 2002 as the date of his

discriminatory "demotion."  (2d Am. Compl. ¶ 21(ff).)  The Court will therefore reaffirm its

dismissal on exhaustion grounds of plaintiff's discrimination claim based on the denial of his

request to stay in Riyadh.

Defendant also argues that plaintiff failed to exhaust several additional discrimination

and retaliation claims.  Specifically, defendant argues that plaintiff identified a number of the

discrete acts at issue as *retaliation* at the administrative level, but failed to identify them as *discrimination*. (*See* Def.'s Mot. at 27.) In particular, plaintiff's June 13, 2000 memorandum to Virtue alleged only that Finch had conducted his May 2000 file review in retaliation for plaintiff's complaints to Virtue about his treatment by Youssef. (Def. Ex. G. at 1, 10.) Similarly, plaintiff's July 8, 2002 e-mail, which sought to amend his May 6, 2002 EEO complaint, alleged that the 2002 security division investigation and the lack of notice given to him about ALAT Abdel-Hafiz's trip to FBI headquarters were done in retaliation (not because of discrimination) for his May 2002 EEO complaint. (*See* Def. Ex. GG at 1.)

Conversely, defendant argues that plaintiff identified several acts as *discrimination* at the administrative level, but not as *retaliation*: (1) the failure of the FBI to respond to plaintiff's requests for additional resources, (2) the on-site review conducted by Gleicher in October 2001, (3) the denial of permission for plaintiff to travel to the U.A.E. as planned, and (4) the debriefing of personnel returning from Riyadh. (Def.'s Mot. at 35). On his May 6, 2002 EEOC complaint form, which raised these allegations, plaintiff checked boxes indicating that he believed that these actions were undertaken as the result of discrimination, but he did not check the box on the complaint form marked "Reprisal." (Def. Ex. O at 1.) However, the text of plaintiff's complaint attached to the EEOC form references Kaciban's "desire to exact revenge" for plaintiff's reporting of an allegedly racist remark in January 2001 and claims that Kaciban "initiated a vendetta" against him. (*Id.* at 9.)

These claims present a closer question. *See Maryland v. Sodexho, Inc.,* 474 F. Supp. 2d 160, 162 (D.D.C. 2007) (plaintiff failed to exhaust administrative remedies for claims of discrimination and harassment on the basis of religion where his EEO charge included only a

claim for retaliatory discharge, and there was no indication in the charge of a claim based on religion, harassment or hostile work environment); *Murphy v. PriceWaterhouseCoopers, LLP*, 357 F. Supp. 2d 230, 239 (D.D.C. 2004) (the failure of employees to allege any retaliation claims in initial or amended administrative charges precluded their assertion of retaliation claims in subsequent ADEA suit against employer).  *But see Sodexho*, 474 F. Supp. 2d at 162 (noting that while the check boxes on the EEOC complaint form make it very easy for an employee to alert his employer to the nature of his claim, "[i]f an employee is uncertain of the cause of discrimination that he believes has occurred, he need only describe it in the text of the charge form").  However, because these claims are subject to dismissal on alternate grounds (*see* Sections III and IV *infra*), the Court need not resolve the issue of exhaustion, and it will instead turn its attention to the merits of plaintiff's claims.  *See Broom v. Caldera*, 129 F. Supp. 2d 25, 29 (D.D.C. 2001) ("[E]xhaustion [is] not jurisdictional in nature but rather [is a] statutory condition[] precedent to the instigation of litigation." (quoting *Kennedy v. Whitehurst*, 690 F.2d 951, 961 (D.C. Cir. 1982))).

## III.    Plaintiff's Discrimination Claims

Plaintiff has alleged seven discrete claims of discrimination that have survived defendant's attack based on exhaustion.[6]  Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to succeed on a claim of discrimination under Title VII, plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  *See id.* at 802.  Specifically, a

---

[6]These are (1) Finch's May 2000 file review; (2) the failure of the FBI to provide plaintiff with more resources after September 11, 2001; (3) Gleicher's October 2001 on-site review; (4) the denial of permission to travel to the U.A.E.; (5) the debriefing of personnel returning from Riyadh; (6) the lack of notice to plaintiff about Abdel-Hafiz's trip to headquarters; and (7) the investigation of plaintiff conducted by the FBI's security division beginning around April 2002.

plaintiff must show that: "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  Title VII plaintiffs need not plead each element of this *prima facie* case to survive a motion to dismiss, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002), but must allege facts that, if true, would establish the elements of each claim.  *Major v. Plumbers Local Union No. 5.*, 370 F. Supp. 2d 118, 128-29 (D.D.C. 2005); *see also Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000) (explaining in the context of a racial employment discrimination case that a plaintiff may survive a motion to dismiss by simply stating that "I was turned down for a job because of my race").  Courts can, however, explore the plaintiff's *prima facie* case at the dismissal stage to determine "whether the plaintiff can *ever* meet his initial burden to establish a *prima facie* case" for Title VII discrimination.  *Rochon v. Ashcroft*, 319 F. Supp. 2d 23, 29 (D.D.C. 2004), *rev'd on other grounds, sub nom. Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Defendant argues that plaintiff's remaining discrimination claims must be dismissed because none of these acts constitutes an actionable "adverse employment action" under Title VII. (*See* Def.'s Mot. at 29.)  For purposes of a Title VII employment discrimination claim, "an employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find *objectively tangible harm*."  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown*, 199 F.3d at 457) (emphasis added). "[N]ot everything that makes an employee unhappy is an actionable adverse action."  *Russell v.*

*Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (internal quotation marks omitted).  "Mere

idiosyncracies of personal preference are not sufficient to state an injury."  *Brown*, 199 F.3d at

457.  Accordingly, the D.C. Circuit has defined an adverse employment action as "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing significant change in benefits."

*Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (internal quotation marks omitted) (citing

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  Applying this precedent, the Court

concludes that plaintiff's remaining claims of discrimination must be dismissed because the

complaint does not "state a claim to relief that is plausible on its face."  *Bell Atl.*, 127 S. Ct. at

1974.

　　　　Four of plaintiff's remaining discrimination claims involve allegations relating to

investigations or monitoring of plaintiff and/or his work performance: (1) the file review

conducted by Finch; (2) the on-site review conducted by Gleicher; (3) the debriefing of temporary

duty personnel returning from Riyadh for information about plaintiff; and (4) the April 2002

loyalty investigation of plaintiff conducted by the FBI's security division after his conversion to

Islam.  These acts do not rise to the level of an adverse action for purposes of a Title VII

discrimination claim.  "Being subject to 'scrupulous monitoring' does not constitute an adverse

action because 'it is part of the employer's job to ensure that employees are safely and properly

carrying out their jobs.'"  *Runkle v. Gonzales*, 391 F. Supp. 2d 210, 226 (D.D.C. 2005)  (quoting

*Hussain v. Principi*, 344 F. Supp. 2d 86, 104-05 (D.D.C. 2004), *aff'd*, 435 F.3d 359, 367 (D.C.

Cir. 2006)); *see also Lester v. Natsios*, 290 F. Supp. 2d 11, 30 (D.D.C. 2003) ("[B]eing closely

supervised or 'watched' does not constitute an adverse action that can support a claim under Title

VII.").  "The mere initiation of an investigation into plaintiff's conduct is not an adverse

employment action when it has no effect on the plaintiff's employment."  *Ginger v. Dist. of

Columbia*, Civ. No. 03-2512, 2007 WL 646249, at *7 (D.D.C. Mar. 5, 2007) (citing *Runkle*, 391

F. Supp. 2d at 226; *Ware v. Billington*, 344 F. Supp. 2d 63, 76 (D.D.C. 2004) ("[A]lthough the

discipline imposed as a result of an investigation may have a sufficiently adverse effect on

plaintiff[']s employment to be actionable, the mere initiation of the investigation does not.")).

Investigations and performance evaluations, such as those conducted here, do not generally rise to

the level of an adverse employment action because the "result of an evaluation is often

speculative, making it difficult to remedy.  For example, a single poor evaluation may drastically

limit an employee's chances for advancement, or it may be outweighed by later evaluations and

be of no real consequence."  *Russell*, 257 F.3d at 818.  Nonetheless, plaintiff argues that the file

review conducted by Finch "led to a false and misleading performance report being submitted to

the Inspection Division of the FBI."  (2d Am. Compl. ¶ 17.)  But even "formal criticism or poor

performance evaluations are [not] necessarily adverse actions" and they should not be considered

such if they did not "affect[] the [employee's] grade or salary."  *Brown*, 199 F.3d at 457-58.  In

this regard, the undisputed evidence demonstrates that these investigations did not cause

"objectively tangible harm" to the "terms, conditions, or privileges" of plaintiff's employment.

*Forkkio*, 306 F.3d at 1131.  He was promoted to the position of LEGAT Riyadh well *after* the

completion of the Finch file review; his tour as LEGAT Riyadh was extended *following* the

Gleicher review in October 2001; and the April 2002 security division investigation, which was

focused on his loyalty to the FBI rather than his job performance as LEGAT Riyadh, was

concluded with no further action taken, and the "charges were determined to be baseless."  (*See*

-22-

2d Am. Compl. ¶¶ 19, 21(bb), 37; 1st Am. Compl. ¶ 96.)

Nor does the FBI's alleged failure to provide plaintiff with additional resources after September 11 constitute an adverse employment action for purposes of Title VII.  Plaintiff claims that although the workload of the Riyadh office increased substantially due to the investigation into the terrorist attacks, plaintiff's requests for additional personnel and resources were ignored, while white LEGATs in other offices in other parts of the world were provided with additional support.  (*See* 2d Am. Compl. ¶¶ 21(f), (h), (p), (q).)  Scarce resources and increased workloads are familiar complaints in virtually every workplace and every industry, but they do not give rise to a discrimination claim under Title VII.  They are merely the "ordinary tribulations of the workplace," which employees should expect from time to time.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see Mack v. Strauss*, 134 F. Supp. 2d 103, 113-14 (D.D.C. 2001) (holding that an allegedly increased workload does not constitute an actionable injury where not accompanied by an adverse change in the terms, conditions, or privileges of employment); *see also Brodetski v. Duffey*, 141 F. Supp. 2d 35, 45 (D.D.C. 2001) (noting that employees should expect to shoulder an "extra load" on occasion).  Especially at the FBI in the aftermath of September 11, the denial of requests for additional personnel and resources was to be expected, and even if one location got more help than another, such conduct cannot be actionable under Title VII.

Plaintiff's discrimination claims regarding the denial of permission to travel to the U.A.E. in October 2001 and the lack of notice given to him about ALAT Abdel-Hafiz's June 2002 trip to FBI headquarters also must fail because these acts had no materially adverse consequences to the terms, conditions, or privileges of plaintiff's employment.  Plaintiff alleges that a trip he had

planned to the U.A.E. to "address outstanding leads relating to the 9/11 investigation" was

unilaterally cancelled by Pyszczymuka.  (2d Am. Compl. ¶ 21(o).)  However, plaintiff's May 6,

2002 administrative complaint reveals that shortly thereafter, "Pyszczymuka's decision was

reversed and travel was authorized," though plaintiff claims that his trip would have been more

"productive" if he had traveled at the time he originally planned.  (Def. Ex. O at 7.)  A decision

that is later reversed does not have an objectively adverse effect on a plaintiff warranting relief

under Title VII.  *See Taylor*, 350 F.3d at 1293-94 ("An employer may cure an adverse

employment action . . . before that action is the subject of litigation."); *Patterson v. Johnson*, 391

F. Supp. 2d 140, 148 (D.D.C. 2005).  Even assuming that plaintiff was able to gather less

information for the FBI than would have been possible had he traveled earlier, the delay did not

have a materially adverse effect on the terms or conditions of *plaintiff's employment* -- he simply

carried out his work responsibilities at the time and in the manner dictated by his supervisors.

Similarly, the lack of notice given to plaintiff about Abdel-Hafiz's trip to FBI headquarters, which

was at most a minor affront to plaintiff's authority as Abdel-Hafiz's supervisor, had no adverse

consequences for the terms, conditions, or privileges of plaintiff's employment.

　　　To the extent that plaintiff objects to these alleged acts of discrimination because he

perceived them as slights or humiliations, that is not enough.  (*See* Pl.'s Opp'n at 38.)  "Purely

subjective injuries, such as . . . public humiliation or loss of reputation . . . are not adverse

actions."  *Forkkio*, 306 F.3d at 1130-31 (quoting *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C.

Cir. 2002)).  Nor is ostracism by one's co-workers.  *See Carter v. Greenspan*, 304 F. Supp. 2d 13,

29 (D.D.C. 2004); *Roberts v. Segal Co.*, 125 F. Supp. 2d 545, 549 (D.D.C. 2000) ("The fact that

plaintiff believes she was getting the cold shoulder from her co-workers does not constitute a

materially adverse consequence or disadvantage in the terms and conditions of her employment

so as to establish an adverse personnel action."); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126

F.3d 239, 243 (4th Cir. 1997) (the shunning of plaintiff by co-workers at direction of supervisor

does not, as a matter of law, rise to the level of an adverse employment action for Title VII

purposes)); *Manning v. Metro. Life Ins. Co.*, 127 F.3d 693, 692-93 (8th Cir. 1997) (ostracism and

disrespect by supervisors does not rise to the level of an adverse employment action).  And the

time plaintiff spent dealing with his administrative complaints may well have distracted him from

his responsibilities, but that distraction cannot be said to have affected the "terms, conditions, or

privileges" of his employment.  *Forkkio*, 306 F.3d at 1131.  Indeed, as plaintiff himself notes, he

received a "meets expectations" performance review during this time (*see* Def.'s Mot. at 32), and

"[c]onduct that sporadically wounds or offends but does not hinder an employee's performance

does not rise to the level of adverse action."  *Childers v. Slater*, 44 F. Supp. 2d 8, 19 (D.D.C.

1999), *modified on recons.*, 197 F.R.D. 185 (D.D.C. 2000); *see also Forkkio*, 306 F.3d at

1130-31.

In sum, each of plaintiff's remaining discrimination claims must be dismissed because the

discrete acts of discrimination he alleges do not, as a matter of law, rise to the level of adverse

employment actions actionable under Title VII.  *See Runkle*, 391 F. Supp. at 222 (dismissing

plaintiff's claims under Rule 12(b)(6) where his allegations -- "even when assumed as true --

d[id] not amount to legally cognizable adverse actions and therefore would not enable him to ever

establish a *prima facie* case under Title VII").

## IV.      **Plaintiff's Retaliation Claims**

Having dismissed four discrete retaliation claims because of failure to exhaust, the Court

will now turn to the remaining seven acts of alleged retaliation. Title VII retaliation claims, like

discrimination claims, are also analyzed under the *McDonnell Douglas* framework, but the *prima*

*facie* requirements for retaliation are "slightly different:" plaintiff must demonstrate that (1) he

engaged in a statutorily protected activity; (2) the employer took an adverse employment action;

and (3) there is a causal relationship between the two. *Clipper v. Billington*, 414 F. Supp. 2d 16,

25 (D.D.C. 2006) (citing *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 148 (D.D.C. 2005);

*Brown*, 199 F.3d at 452; *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C.

Cir. 2003)).  Again, while plaintiff is not required to plead each element of this *prima facie* case

to survive a motion to dismiss, *Swierkiewicz*, 534 U.S. at 515, the Court may explore the

plaintiff's *prima facie* case at the dismissal stage to determine "whether the plaintiff can ever

meet his initial burden to establish a *prima facie* case."  *Rochon*, 319 F. Supp. at 29.

 Even presuming the truth of all the allegations in plaintiff's complaint, three of plaintiff's

retaliation claims fail as a matter of law because the discrete acts alleged do not rise to the level of

an adverse employment action for purposes of a retaliation claim: (1) the lack of notice to plaintiff

about Abdel-Hafiz's trip to headquarters in June 2002; (2) the failure of the FBI to provide

plaintiff with additional resources after September 11; and (3) the denial of permission to travel to

the U.A.E.  Recently, in *White* the Supreme Court explained that the "anti-retaliation provision

[of Title VII] protects an individual not from all retaliation, but from retaliation that produces an

injury or harm." 126 S. Ct. at 2414.  The *White* Court defined the requisite harm for a retaliation

claim as an action that "well might have 'dissuaded a reasonable worker from making or

supporting a charge of discrimination.'" *Id.* at 2415 (quoting *Rochon*, 438 F.3d at 1219).  An

adverse action in the retaliation context may involve something short of what ordinarily would be

considered a "personnel action" (*e.g.*, denial of promotion, discharge, salary reduction), but a plaintiff nonetheless must point to an action that a "reasonable employee would have found . . . materially adverse." *White*, 126 S. Ct. at 2415; *see Stewart*, 275 F.3d at 1134.  For the same reasons as set forth in the preceding section, even under this more expansive definition of adverse action, these three acts are not actionable as retaliation under Title VII.  Plaintiff does not allege any adverse consequence, much less a *materially* adverse consequence that resulted from his lack of notice about Abdel-Hafiz's trip.  At most, it was a minor affront to his authority as Abdel-Hafiz's supervisor.  As noted above, Pyszczymuka's decision to cancel plaintiff's U.A.E. trip was reversed shortly thereafter, and plaintiff *did* travel to the U.A.E., albeit somewhat later than originally planned.  (Def. Ex. O at 7.)  The fact that, as he alleges, he may have gathered more information or been more productive for the FBI had he traveled earlier did not have a materially adverse effect on *plaintiff*.  And, increased workloads and scarce resources are to be expected in any workplace, especially at the FBI after September 11.  The denial of requests for additional support cannot be the basis for a retaliation claim under such circumstances.  To hold otherwise would give every overworked employee in an understaffed office fodder for a Title VII claim.  Moreover, even under *White*, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  *White*, 126 S. Ct. at 2415.

Therefore, no reasonable juror could find that these three common workplace grievances would deter a *reasonable* employee from making or supporting a charge of discrimination.  *Id.* Indeed, they did not deter plaintiff from pursuing his charges of discrimination.  On the contrary, he continued to file and pursue EEO discrimination and retaliation complaints after each one of

these alleged acts occurred.  (*See* Def. Exs. O, GG, II, KKK.)  Accordingly, these three retaliation claims must be dismissed.

Plaintiff's remaining retaliation claims relate to the monitoring and investigation of plaintiff and his work performance: (1) the file review conducted by Finch; (2) the on-site review conducted by Gleicher; (3) the debriefing of temporary duty personnel returning from Riyadh for information about plaintiff; and (4) the investigation of plaintiff conducted by the FBI's security division after his conversion to Islam.  The Court has already dismissed plaintiff's discrimination claims based on these allegations because they do not rise to the level of adverse action for purposes of a discrimination claim, but given *White*, the same analysis does not control the determination of whether these claims constitute adverse action for purposes of a retaliation claim.  For instance, in *Velikonja v. Gonzalez*, 466 F.3d 122 (D.C. Cir. 2006), the D.C. Circuit raised but declined to address the question of whether a "mere investigation," without more, can constitute an adverse action for purposes of a retaliation claim under *White*.  *Id.* at 123-24.  The plaintiff in *Velikonja* alleged not just that she was subject to an investigation, but that she was prevented from receiving promotions during the pendency of the investigation.  *Id.* at 124.  Applying *White*, the Court found that the retaliation claim could survive a motion to dismiss, "[b]ecause a reasonable jury could find that the prospect of such an investigation could dissuade a reasonable employee from making or supporting a charge of discrimination."  *Id.*  At least one decision in this district has since held on summary judgment, without citing *Velikonja* and relying on pre-*White* cases, that a mere investigation, without more, does not constitute adverse action under *White*.  *See Ginger*, 2007 WL 646249, at *6-7.  District courts in another circuits have reached the opposite conclusion.  *See Nelson v. Sprint/United Mgmt. Co.*, Civ. No. 05-2350, 2006

WL 2734586, at *12 (D. Kan. Sept. 25, 2006); *Doucet v. Univ. of Cincinnati*, Civ. No. 05-148,

2006 WL 2044955, at *22 n.19 (S.D. Ohio July 19, 2006) ("The initiation of a formal disciplinary

investigation -- even one that does not result in formal discipline -- would satisfy [the *White*]

standard.").  In contrast to *Ginger*, this case has not yet proceeded to discovery, and given the

unsettled state of the law after *White*, this Court will not dismiss plaintiff's allegations regarding

monitoring and investigations.

Defendant also argues for dismissal of these claims because plaintiff cannot establish a

causal connection between the alleged acts and any protected activity.  (Def.'s Mot. at 37.)  To

make out a *prima facie* case of retaliation, the plaintiff must show "that a causal connection

existed" between his statutorily protected activity and the adverse actions taken against him.

*Brown*, 199 F.3d at 452-53 (internal citations omitted).  Under Title VII, "protected activity" is

defined as an "employee's opposition to an unlawful employment practice or . . . an employee's

participation in a discrimination charge, investigation, or proceeding."  *Burton v. Batista*, 339 F.

Supp. 2d 97, 114 (D.D.C. 2004).  "While no 'magic words' are required" to mark an exchange as

protected activity, the employee "must in some way allege unlawful discrimination."  *Broderick

v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  Plaintiff's January 2000 complaint to

Virtue about discrimination by Youssef,[7] his June 13, 2000 memorandum to Virtue alleging that

the Finch file review was conducted in retaliation against him, his three formal EEO complaints,

and his July 8, 2002 e-mail amending his prior EEO complaint -- all of which alleged unlawful

---

[7]Defendant argues that this claim, which was referred to the FBI's Employee Assistance Program ("EAP"), is not protected activity that could be the basis for a retaliation claim because EAP services "are not a substitute for [EEO] counseling."  (*See* Def.'s Mot. at 38.)  However, "opposition to an unlawful employment practice" qualifies as protected activity even if it may have occurred outside of the EEO context.  *See Broderick*, 437 F.3d at 1232.

discrimination -- qualify as protected activity under Title VII.

In the absence of any direct evidence, a plaintiff may demonstrate a causal connection between the protected activity and an adverse action based only on the temporal proximity between the employer's knowledge of a protected activity and the adverse employment action where plaintiff can show "that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985); *see also Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001); *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006); *Willingham v. Gonzales*, 391 F. Supp. 2d 52, 61 (D.D.C. 2005) ("By showing both knowledge and proximity in time, plaintiff may establish the causal connection needed for a *prima facie* case of retaliation." (quoting *Brodetski v. Duffey*, 141 F. Supp. 2d at 42-43) (internal quotation marks omitted)).  This Court has often followed a three-month rule to establish causation on the basis of temporal proximity alone.  *See Willingham*, 391 F. Supp. 2d at 61-62; *see also Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007) (per curiam) (noting that the Supreme Court in *Breeden* cited with approval circuit cases rejecting temporal proximity of three and four months as evidence of causation); *Buggs v. Powell*, 293 F. Supp. 2d 135, 148 (D.D.C. 2003); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (referring to end of three-month window as the "outer limit" of the "temporal requirement in a retaliation case"), *aff'd*, No. 04-5181, 2004 WL 2348142, at *1 (D.C. Cir. Oct. 19, 2004).  However, the Court is unable to resolve the issue of causal connection based on the record before it.  As plaintiff notes, he has not yet been afforded sufficient discovery to determine "[w]hat knowledge the defendant's agents had of the plaintiff's EEO activity and when they gained that knowledge." (Pl.'s Opp'n at

39.)

Therefore, it is premature to dismiss these claims at this stage given the existence of factual issues that have not yet been adequately explored relating to the circumstances surrounding these investigations.

## V.     Plaintiff's Hostile Work Environment Claim

Plaintiff claims that throughout the time he was in Riyadh, the "same set of management personnel" -- including Director Mueller, Kaciban, Beverly, Pyszczymuka, Gleicher, Curtis, Fowler and D'Amuro -- subjected him to a hostile work environment based on his race, religion, and national origin.  (2d Am. Compl. ¶ 20.)  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Morgan*, 536 U.S. at 117 (internal quotation marks omitted).  The workplace becomes "hostile" for purposes of a Title VII claim only when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[8]  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *accord Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  To make out a *prima facie* case of hostile work environment, plaintiff must also show that the harassment was based on

---

[8]Unlike claims involving discrete acts of discrimination or retaliation, claims of hostile work environment involve a repeated course of conduct which "cannot be said to occur on any particular day," *Morgan*, 536 U.S. at 115, and a plaintiff who has properly exhausted such a claim may support it with related conduct that was not part of his administrative claims. *Nichols v. Truscott*, 424 F. Supp. 2d 124, 134 n.9 (D.D.C. 2006).  Plaintiff's May 6, 2002 EEO complaint alleged that he was subject to a hostile work environment based on his race and national origin (Def. Ex. O at 1), and defendant does not dispute that plaintiff has properly exhausted his hostile work environment claim.

plaintiff's membership in a protected class, and that his employer knew or should have known of the harassment and failed to take any remedial action.  *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2000) (citing *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)); *see also Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006). While a plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim.  *See Sparrow*, 216 F.3d at 1114. In determining whether an environment is sufficiently hostile or abusive to support a claim, courts must look at "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-88 (1998) (quoting *Harris*, 510 U.S. at 23).  "[N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable."  *Stewart*, 275 F.3d at 1133 (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999)).  The "conduct must be *extreme* to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (emphasis added).  This standard is designed to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.* (quoting *Oncale*, 523 U.S. at 80).

Plaintiff's complaint alleges that the hostile work environment was created by approximately thirty-six different acts,[9] though some of these allegations appear to be based on the same incidents.  These allegations can be grouped as follows: (1) the denial of personnel and other resources requested after September 11; (2) investigations and monitoring of him and his

---

[9]In granting plaintiff leave to amend his complaint for the second time, the Court directed him to describe "precisely" the nature of the hostile work environment claim and what conduct it is based on.  (*See* 1st Mot. to Dismiss Hr'g Tr. at 35, 39.)

office; (3) the undermining of his authority as LEGAT Riyadh by excluding him from communications and meetings and cutting him out of the chain of command; (4) allegedly discriminatory comments and/or threats; and (5) what he characterizes as his "demotion" to the New York position along with the simultaneous improvements made to the LEGAT Riyadh position after his departure.  (*See* 2d Am. Compl. ¶ 21.)

It is apparent from the face of the complaint that plaintiff fundamentally misunderstands the nature of the hostile work environment claim.  Title VII does not provide a cause of action for the "ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, and "not everything that makes an employee unhappy is an actionable" under Title VII.  *Jones v. Billington*, 12 F. Supp. 2d 1, 13 (D.D.C. 1997) (quoting *Manning v. Metro. Life Ins. Co.*, 127 F.3d at 692-93) (internal quotation marks omitted), *aff'd*, 1998 WL 389101, at *1 (D.C. Cir. Jun. 30, 1998).  Instead, a hostile work environment claim must be based on incidents comprising "one unlawful employment practice" of intimidation, insult and ridicule that pervades plaintiff's day-to-day working life.  *Morgan*, 536 U.S. at 117; *see Harris*, 510 U.S. at 21-22; *Singletary v. Dist. of Columbia*, 351 F.3d 519, 527 (D.C. Cir. 2003) (Plaintiff must demonstrate that "the acts about which [he] complains are part of the same actionable hostile work environment practice." (quoting *Morgan*, 536 U.S. at 120) (internal quotation marks omitted)).  Plaintiff cannot satisfy this standard, for none of the acts alleged by plaintiff, whether considered alone or cumulatively, meet the demanding standards for a hostile work environment claim under Title VII.

For example, plaintiff lists several unrelated comments that he claims contributed to the hostile work environment: the alleged comment in January 2001 by Kaciban about "cut[ting] [his] balls off," another comment by Kaciban made outside plaintiff's presence in September 2001

about plaintiff's "Arab brothers," and a comment in an e-mail from Robert Jones in January 2003 suggesting that plaintiff was disloyal to the FBI.  (2d Am. Compl. ¶¶ 21(c), (g), (z).)  Plaintiff also claims that he was the subject of a "general rumor" within the FBI that he was disloyal to the United States because of his conversion to Islam, and that he was "threatened" by Curtis that unless he selected a position from several available vacancies after his request for an extension of his tour in Riyadh was denied, he might end up at a lower-level job.  (*Id.* ¶¶ 21 (dd), (gg).)  These various disparate comments, spread out over a period of two years, do amount to the type of severe harassment contemplated by Title VII.  The comment about plaintiff's Arab brothers was not even made in Rattigan's presence, nor were the e-mail from Robert Jones or the "general rumor" of his disloyalty directed at plaintiff.  Even assuming these comments had something to do with plaintiff's race or religion, which is not at all obvious, "[w]hen racial statements are not made directly to [protected class member], generally a hostile environment cannot be established."  *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) (citations omitted), *aff'd*, *sub nom. Nurriddin v. Griffin*, 2007 WL 1126199, at *1 (D.C. Cir. Apr. 16, 2007); *see also Lester*, 290 F. Supp. 2d at 31("[C]onduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment."); *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.").  The alleged "threat" by Curtis is far from harassment, rather, it is a frank explanation of Rattigan's employment options within the FBI after his Riyadh extension was denied.  And even plaintiff concedes that Kaciban's comment about cutting off his balls, while arguably crude, was not meant as a literal threat of castration.  (Pl.'s Opp'n at 24.)  Title VII is not a "general civility code" for the workplace, *Oncale*, 523 U.S. at 80,

and it does not redress "the ordinary tribulations of the workplace, such as sporadic use of abusive language." *Faragher*, 524 U.S. at 788. Accordingly, "a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart*, 275 F.3d at 1134 (citing *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish Title VII liability)); *Park*, 71 F.3d at 906 (noting that "isolated manifestations of a discriminatory environment" may not raise a cause of action); *Bundy v. Jackson*, 641 F.2d 934, 943 n.9 (D.C. Cir. 1981) (finding that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action" under Title VII); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor involved never touched the employee and incidents were not sufficiently severe or pervasive); *Ramey v. Potomac Elec. Power Co.*, 468 F. Supp. 2d 51, 58 (D.D.C. 2006) (dismissing a hostile work environment claim based substantially on "isolated comments").

Plaintiff's allegations about the actions that he claims undermined his authority within the FBI and with the Saudi government and cut him out of the chain of command are also insufficient to support a hostile work environment claim. These allegations include claims that Gleicher "bypassed" him to seek information from the Saudis, that his direct supervisors stopped communicating with him directly and instead channeled communication through Kaciban, that temporary duty personnel sent to Riyadh were instructed to report directly to FBI headquarters instead of to plaintiff, that he was excluded from an annual LEGAT conference because he was ordered to attend a management seminar instead, and that he was not advised of certain meetings

between D'Amuro and Saudi officials.  (2d Am. Compl. ¶¶ 21(e), (m), (n), (r), (x), (y).)  As held

by numerous courts, these allegations do not constitute severe and pervasive ridicule, harassment,

or intimidation.  *See, e.g., Quarless v. Bronx Leb. Hosp. Ctr.*, 75 F. App'x 846, 848 (2d Cir. 2003)

(upholding district court's dismissal of hostile work environment claim based on plaintiff's

allegations that he was "shunned, kept away from meetings he usually attended, and his authority

was undermined," because none of these allegations constituted "pervasive discriminatory

intimidation, ridicule, and insult" (internal quotation marks omitted)); *Patterson*, 391 F. Supp. 2d

at 146 (alleged incidents in which plaintiff's authority was "undermined" did not rise to the level

of a hostile work environment); *Bergin v. N. Clackamas Sch. Dist.*, Civ. No. 03-1412, 2005 WL

66069, at *19 (D. Or. Jan. 12, 2005) ("shunning and humiliation" by co-workers, though

"pervasive and continuous," was not sufficient to support a hostile work environment claim);

*Miller v. Aluminum Co. of Am.*, 679 F. Supp. 495, 505 (W.D. Pa.1988) ("snubbing" by

supervisors does not amount to an actionable hostile work environment).

Other acts alleged by plaintiff are simply too common a workplace grievance to support a

hostile work environment claim.  Plaintiff's complaints about the denial of his requests for

additional resources despite an increased workload after September 11 and the occasional

cancellation or postponement of both work-related and personal travel plans, including the

cancellation of plaintiff's planned trip to Mecca to participate in the Hajj in February 2003, are

the type of employee grievances that can reasonably be expected to arise in every workplace.

(*See* 2d Am. Compl. ¶¶ 21(a), (b), (f), (h), (o), (p), (q), (t), (cc).)  These affronts may

understandably have made plaintiff unhappy, but they are  nothing more than the "ordinary

tribulations of the workplace" which Title VII is not available to redress.  *Faragher*, 524 U.S. at

788.  Plaintiff's allegations about resources and cancelled trips are not the type of "extreme" conduct necessary to support a hostile work environment claim, *see id.*, and they certainly "do not demonstrate a work environment that was pervaded by discrimination."  *Singh v. U.S. House of Reps., Comm. on Ways & Means*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004).  The various investigations that plaintiff complains of are also insufficient to support his hostile work environment claim for substantially the same reasons as set forth in the Court's analysis (*see* Section III, *supra*) of plaintiff's discrimination claims.  (*See* 2d Am. Compl. ¶¶ 21(i), (j), (k), (s), (t), (v), (bb).)  Close supervision or monitoring by an employer is not uncommon (nor should it be discouraged), and many of these alleged incidents took place outside of plaintiff's presence, and sometimes even without his knowledge.  (*See id.* ¶¶ 21(j), (k), (s).)  These unrelated and sporadic investigations spread over a period of three years did not amount to a practice of intimidation, insult or ridicule that pervaded plaintiff's day-to-day working life in Riyadh or altered the "conditions of [his] employment."  *See Harris*, 510 U.S. at 21; *Oncale*, 523 U.S. at 81.  Plaintiff also supports his claim with allegations about changes made to the LEGAT Riyadh position after he left.  (*See* 2d Am. Compl.  ¶¶ 21(hh), (ii).)  Such allegations are obviously irrelevant since they had absolutely no effect on *his* work environment while in Riyadh.

In addition, a large number of the allegations on which plaintiff relies are nothing more than the discrete acts on which he bases his discrimination and retaliation claims, including his transfer to New York, the FBI's failure to provide additional resources after September 11, the debriefing of personnel returning from Riyadh, the "channeling" of oral communications with plaintiff through Kaciban, the cancellation of plaintiff's U.A.E. trip, the "unauthorized" travel of FBI to the Arabian peninsula, and the various investigations.  (*See* 2d Am. Compl. ¶¶ 21(a), (b),

(f), (h), (i), (j), (k), (m), (o), (p), (q), (x), (bb), (ff), (ii).)  Plaintiff should not be permitted to "bootstrap" his alleged discrete acts of discrimination and retaliation into a broader hostile work environment claim.  *Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005).  "Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult."  *Lester*, 290 F. Supp. 2d at 33; *see also Wada v. Tomlinson*, Civ. No. 03-1488, 2007 WL 1378516, at * 58 (D.D.C. May 9, 2007); *Silver v. Leavitt*, Civ. No. 05-0968, 2006 WL 626928, at *12 (D.D.C. Mar. 13, 2006).  "[T]he dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent.  Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address."  *Parker v. State Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 475 (D. Del. 1998).  A hostile work environment under Title VII must be based on "one unlawful employment practice" of pervasive, insulting, discriminatory conduct that makes the plaintiff's day-to-day work environment severely "abusive."  *Morgan*, 536 U.S. at 117; *Oncale*, 523 U.S. at 81.  Therefore, cobbling together a number of distinct, disparate acts will not create a hostile work environment.  For example, if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate  claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult and ridicule.  This is particularly true here because plaintiff failed to exhaust administrative remedies for many of the discrimination and retaliation claims that he now incorporates into a hostile work environment claim.  *See Patterson*, 391 F. Supp. 2d at 146 (A "plaintiff cannot cure his failure to timely exhaust his

complaints about [certain] incidents by sweeping them under the rubric of a hostile work environment claim.").

Assuming the truth of all of plaintiff's allegations and drawing all inferences in his favor as one must do at this stage, the Court nonetheless holds that plaintiff cannot state a claim for hostile work environment.  Plaintiff must show far more than scarce resources, occasional off-color remarks or criticisms, and snubs or perceived slights to establish a hostile work environment.  Even assuming that the actions plaintiff alleges were all motivated by unlawful discrimination, which is far from clear, the totality of the incidents alleged does not establish a pattern of "severe and pervasive" conduct that altered the conditions of plaintiff's working environment.  *See Oncale*, 523 U.S. at 81.  Accordingly, plaintiff's hostile work environment claim must be dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss [Dkt. #42] is denied in part as to plaintiff's claims of retaliation based on (1) the May 2000 file review conducted by Finch; (2) the October 2001 on-site review conducted by Gleicher; (3) the debriefing of temporary duty personnel returning from Riyadh for information about plaintiff; and (4) the investigation of plaintiff conducted by the FBI's security division.  Defendant's motion to dismiss is granted as to all of plaintiff's discrimination claims, his hostile work environment claim, and the remainder of plaintiff's retaliation claims.  Defendant's motion for summary judgement is denied without prejudice to be renewed at the close of discovery on plaintiff's four remaining retaliation claims.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: May 31, 2007