# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **WILFRED SAMUEL RATTIGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-2009 (ESH)** |
| | ) | |
| **ERIC H. HOLDER, JR.,** | ) | |
| **Attorney General,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

## <u>MEMORANDUM OPINION</u>

This matter is here once again on defendant's motion for summary judgment.  Plaintiff

Wilfred Rattigan, a black male of Jamaican descent who converted to Islam in December 2001,

is employed by the Federal Bureau of Investigation ("FBI").  He claimed that his employer

discriminated against him on the basis of his race, national origin, and religion; retaliated against

him for complaining about that discrimination; and subjected him to a hostile work environment

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

On August 2, 2006, the Court granted defendant's motion to dismiss certain of plaintiff's claims

for failure to exhaust.  *Rattigan v. Gonzales*, No. 04-CV-2009, 2006 WL 4916613, at *1 (D.D.C.

Aug. 2, 2006) ("*Rattigan I*").  On May 31, 2007, the Court granted defendant's motion to dismiss

the rest of plaintiff's claims with the exception of four retaliation claims relating to the

investigation of plaintiff's work performance.  *Rattigan v. Gonzales*, 503 F. Supp. 2d 56 (D.D.C.

2007) ("*Rattigan II*").  Defendant has now moved for summary judgment on the four remaining

retaliation claims.  For the reasons set forth below, defendant's motion will be denied with

respect to the events surrounding the investigation of plaintiff by the FBI's Security Division, but granted in all other respects.

## BACKGROUND

As this is the third dispositive motion to have arisen from plaintiff's claims of discrimination and retaliation, the Court need not repeat the facts and procedural history which are set forth in *Rattigan II*, 503 F. Supp. 2d at 62-67, but will limit its discussion to those facts that relate to the four remaining retaliation claims.

The FBI maintains Legal Attache, or "LEGAT," offices in more than 40 different countries.  Each LEGAT office is typically staffed with two agents referred to as the Legal Attache ("Legat") and Assistant Legal Attache ("ALAT").  LEGAT Riyadh is the LEGAT office in Riyadh, Saudi Arabia, and is housed in the U.S. Embassy.  A primary function of the LEGAT Riyadh office was to transmit investigatory leads from other components of the FBI to the Saudi state security service (the Mabahith) and to similar agencies in the six other Arab countries within the office's territorial jurisdiction, in the hope that these agencies would cooperate by providing the information that the FBI requested.

All LEGAT offices and their personnel report directly to the FBI component now known as the Office of International Operations ("OIO"), located at FBI headquarters ("FBIHQ") in Washington, D.C.  At all relevant times, the chain of command within OIO consisted of an assistant director ("AD"), a deputy assistant director ("DAD"), two section chiefs ("SCs"), and five unit chiefs ("UCs") (collectively "OIO management").  Assisted by subordinates, two of the UCs supervised all of the LEGAT offices.

From February 1999 to July 2000, plaintiff was the ALAT in Riyadh; from July 2000

through July 2003, he was the Legat.  Plaintiff's request for an extension of duty in Riyadh was denied in December 2002, and in July 2003, he began an assignment in the FBI's New York field office as a supervisor in a new counterterrorism squad.  (Def.'s Ex. 2I (EEO Compl., Mar. 16, 2004) at 3; Def.'s Ex. 2J (EEO Counseling Report, Apr. 30, 2004) at 6; Def.'s Ex. 2N (Curtis Electronic Communication ["EC"], Feb. 3, 2003) at 1.)  Plaintiff now serves in the FBI's field office in Jackson, Mississippi, as an Assistant Special Agent in Charge.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ["Opp'n"] at 1.)

Plaintiff contends that in response to his complaints about workplace discrimination, defendant retaliated by engaging in the following adverse actions relating to the monitoring or investigation of plaintiff and his work performance: (1) the May 2000 file review conducted by Supervisory Special Agent ("SSA") Albert Finch ("Finch review"); (2) the October 2001 on-site review conducted by Unit Chief Cary Gleicher ("Gleicher review"); (3) the debriefing of three temporary duty personnel ("TDYers") returning from Riyadh ("debriefings"); and (4) the investigation of plaintiff by the FBI's Security Division ("security investigation").  *See Rattigan II*, 503 F. Supp. 2d at 82.  The factual background underlying these four claims is as follows:

## I.      THE FINCH REVIEW

From February 1999 to July 2000, Bassem Youssef was the Legat in Riyadh.  Youssef and plaintiff had a "very acrimonious" relationship, seemingly from the moment they met when Youssef told plaintiff that he had supported someone else for the ALAT position.  (Def.'s Ex. 4L (Rattigan Dep., Dec. 7, 2007) ["Rattigan Dep."] at 34:1-2, 38:16-39:7.)  In January 2000, plaintiff sought Equal Employment Opportunity ("EEO") counseling regarding Youssef's alleged racial discrimination against plaintiff.  (Def.'s Ex. G (EEO request, June 13, 2000)

["EEO Request"] at 1.)  The matter was referred to the FBI's Employee Assistance Program

("EAP"), which seeks to minimize occupational stress and maximize productive worklife by

using counselors to provide FBI employees with confidential assessment, short-term counseling,

and referrals.  (Pl.'s Statement in Opp'n to Def.'s Statement under LCvR 7(h) and 56.1 and Pl.'s

Statement under LCvR 7(h) and 56.1 ["Pl.'s Facts"] at 4-5.)  Problems addressed by the EAP

include "stress, marital/family problems, mental and/or emotional issues, alcoholism, drug abuse,

and financial concerns."  (*Id.* at 5.)  In March 2000, an EAP counselor arrived in Riyadh and held

meetings with plaintiff, Youssef, and other office personnel to propose changes in various office

policies, to which Youssef agreed.  (EEO Request at 2.)

       In April 2000, plaintiff obtained permission from OIO to take a vacation and requested

that OIO assign someone to fill in for him on a temporary duty ("TDY") basis during his month-

long absence beginning on May 20.  (Pl.'s Facts at 13-14.)  SC Tony Knowles asked SSA Finch

to fill in, and Finch, an African-American and former ALAT and Legat in Cairo, accepted the

assignment.  (*Id.* at 14-15.)  Before traveling to Riyadh, Finch reviewed Chief Inspector Henry

Ragle's December 1999 inspection report for the office and made a list of outstanding cases and

unaddressed leads.  (Def.'s Ex. 3Z (Finch Dep., Nov. 27, 2007) ["Finch Dep."] at 29-33; *see also*

Def.'s Ex. 4H (Ragle Inspection Report) at 3.)  When Finch reported for duty in Riyadh on May

18, he spent about a week reviewing the office files to determine what leads needed to be

investigated.  (Finch Dep. at 46:8-17.)  On May 24, Finch sent a report, entitled "Riyadh Legal

Attache (LEGAT) Inspection Follow Up File Review (ALAT Wilfred Rattigan)," to Chief

Inspector Ragle, Legat Youssef, and SC Knowles.  (Def.'s Ex. J (Finch EC, May 24, 2000) ["1st

Finch Report"] at 1.)  The report stated that based on Finch's review of files in cases assigned to

plaintiff, plaintiff's "overall performance was found to be less than adequate," in part because

Finch found little evidence that plaintiff had followed up on many outstanding leads.  (*Id.* at 1-2.)

On May 29, plaintiff learned that Finch had reviewed his files, and on June 7, he returned to

Riyadh.  (EEO Request at 4.)  On June 10, plaintiff had a long meeting with Finch during which

they discussed all of plaintiff's cases, and plaintiff explained that some investigatory work had

been done but not yet documented and that Youssef was to blame for any problems.  (Def.'s Ex.

K (Finch EC, June 10, 2000) ["2d Finch Report"] at 1; Finch Dep. at 61:14-17.)  That same day,

Finch emailed a supplemental report to Ragle, Youssef, and Knowles citing plaintiff's

explanations, characterizing plaintiff's performance as "effective and efficient, given the

resources assigned to Riyadh," and identifying Youssef as the one responsible for any

deficiencies.  (*See* 2d Finch Report at 1-2; Finch Dep. at 77:9-18.)  Soon after, Youssef left

LEGAT Riyadh.  Plaintiff was promoted to Legat and began his tour of duty on July 2, 2000.

(Def.'s Ex. L (Gleicher EC, Oct. 31, 2001) ["Gleicher Report"] at 2.)  Gamal Abdel-Hafiz began

his tour as ALAT in February 2001.  (*Id.*)

## II.    THE GLEICHER REVIEW

Immediately following the terrorist attacks of September 11, 2001, UC Gleicher reached

out to the Legats under his supervision, including plaintiff, to apprise them of the day's events

and to offer assistance.  (Def.'s Ex. P (Gleicher EEO Aff., June 30, 2003) ["Gleicher Aff."] at 3.)

Plaintiff initially indicated that LEGAT Riyadh did not need any TDYers, but later advised

Gleicher on September 13 that he did need assistance and specifically requested Special Agent

("SA") Beth Babyak, who had previously worked in LEGAT Riyadh as a TDYer.  (*Id.* at 3-4;

Def.'s Ex. 4J (Babyak EEO Aff., Apr. 9, 2003) ["Babyak Aff."] at 2.)  Gleicher went through his

5

chain of command to request Babyak's deployment, but was instructed by Section Chief Mike Pyszczymuka and Deputy Assistant Director Leslie Kaciban not to send her.[1]  (Gleicher Aff. at 3.)  Gleicher sent Babyak anyway, and Kaciban was angry at Gleicher for his insubordination.  (*Id.* at 4; Def.'s Ex. 4B (Gleicher Dep., Jan. 31, 2008) ["Gleicher Dep."] at 143:8-12.)  Babyak began work in Riyadh on September 21.  (*See* Gleicher Report at 1.)  SA Matthew Taylor followed on September 23, as did SSA Judson Ray of the Investigative Services Division on October 1 and SA Ammar Barghouty, a native Arabic speaker, on October 4.  (*See id.*)  On September 26, plaintiff emailed Gleicher to extend his "sincere thanks" for dispatching the TDYers and to ask for additional personnel.  (Def.'s Ex. 4V (Rattigan EC, Sept. 26, 2001) at 1-2.)  On October 3, plaintiff emailed Gleicher, SC Pyszczymuka, and DAD Kaciban with an expanded request for personnel and weapons given plaintiff's heightened security concerns in anticipation of the U.S. invasion of Afghanistan.  (Def.'s Ex. S (Rattigan EC, Oct. 3, 2001).)

Since OIO was unable to satisfy the need of every LEGAT Office for additional assistance, it had to determine how best to allocate its limited personnel and resources.  (Pl.'s Facts at 39-40.)  In mid-October 2001, Kaciban and Pyszczymuka sent Gleicher to conduct on-site reviews of four Middle Eastern LEGAT offices that fell under Gleicher's supervision:  Riyadh, Amman, Tel Aviv, and Abu Dhabi.  (Gleicher Report at 1.)  On October 15, Gleicher's first full day at LEGAT Riyadh, plaintiff confronted Gleicher privately and accused him (as well as Kaciban and Pyszczymuka) of not granting his October 3 weapons requests because of his

---

[1] OIO management's stated reason was that Babyak was female, which Gleicher attributed to concerns about the Saudis' cultural views about women.  (Gleicher Aff. at 3-4.)  Several months earlier, plaintiff voiced similar concerns to OIO management when he reported that Babyak's "significant contributions" to LEGAT Riyadh were constrained by "the inescapable impediment" of "her gender and the attendant restrictions in the Gulf Region, particularly in Saudi Arabia." (Def.'s Ex. 4S (Rattigan EC, June 26, 2001) at 2.)

race.  (Gleicher Aff. at 9; Pl.'s Facts at 42.)  Later that day, during a meeting of all office personnel, plaintiff publicly accused Gleicher of ignoring plaintiff's requests for weapons in a manner that Gleicher, Babyak, and Taylor viewed as "unprofessional" and "confrontational." (Gleicher Aff. at 9; Babyak Aff. at 7; Def.'s Ex. 5B (Taylor EEO Aff., July 7, 2003) ["Taylor Aff."] at 2.)  Gleicher later met individually with all office personnel and spent considerable time with Babyak in particular to assess the office's workload, organizational structure, and administrative system for processing and documenting investigatory leads.  (Gleicher Report at 4-8; Babyak Aff. at 6-7; Pl.'s Facts at 43.)

After visiting the other LEGAT offices, Gleicher returned to FBIHQ and prepared a draft EC to Kaciban, Pyszczymuka, and Assistant SC Walter Smith regarding his visit to LEGAT Riyadh.  (Pl.'s Facts at 45.)  The report initially cited plaintiff's confrontations with Gleicher and allegations of racism (*see* Def.'s Ex. 4X (Draft Gleicher Report) at 1-2, 4-5), but Gleicher removed these passages at Kaciban or Smith's instruction so that the final version that was uploaded to the FBI's computerized Automated Cases System ("ACS") would not "jeopardize" plaintiff's career.  (Gleicher Dep. at 44:4-9; Gleicher Aff. at 14.)  Gleicher's final report was dated October 31, 2001.  (*See* Gleicher Report at 1.)  Gleicher never made any effort to have plaintiff disciplined for Gleicher's treatment while in Riyadh.  (Pl.'s Facts at 46.)

On November 6, 2001, plaintiff was informed by EC that Gleicher, Pyszczymuka, Kaciban, and Smith had approved his request for a one-year extension of his tour as Legat from July 2002 to July 2003.  (Def.'s Ex. 4Z (Conway EC, Nov. 6, 2001) at 1; Pl.'s Facts at 46-47.) On November 9, plaintiff contacted an EEO counselor to complain that OIO management had discriminated against him by, among other things, failing to provide him with adequate support

following the September 11 attacks.  (Def.'s Ex. 5A (EEO Report, May 23, 2002) ["EEO

Report"] at 2-3; Pl.'s Facts at 47.)  Around this same time, plaintiff informed Gleicher,

Pyszczymuka, and Kaciban of this EEO complaint.  (Pl.'s Facts at 47.)

## III.   THE DEBRIEFINGS

Sometime after SA Taylor departed Riyadh in November 2001, he called UC Gleicher

"to tell him that things had gone well during [his] TDY"; to say that "[he] felt badly about the

confrontation" he witnessed in Riyadh between plaintiff and Gleicher; and to say that "[he]

thought that [Gleicher] had handled the situation well."  (Taylor Aff. at 2.)  Gleicher "did not

want to be in the position of receiving such information, albeit unsolicited," because he

anticipated that plaintiff might file an EEO complaint, so he forwarded the call to SC

Pyszczymuka, and Taylor repeated his description of the incident.  (Gleicher Aff. at 11-12;

Taylor Aff. at 2-3.)  Pyszczymuka asked Taylor if he would be willing to document the incident,

but Taylor demurred in the absence of an official request for such documentation, because he

thought well of both plaintiff and Gleicher.  (Taylor Aff. at 3.)  At Pyszczymuka's instruction,

Gleicher later called Taylor and left a voice message repeating Pyszczymuka's documentation

request and providing the administrative file number for LEGAT Riyadh, which Taylor could

use in the event he chose to file a report, which he did not.  (Gleicher Aff. at 12.)

When Babyak returned from Riyadh in November 2001, she was asked to meet with

DAD Kaciban and Pyszczymuka, although Kaciban was unable to make that meeting.[2]  (Babyak

Aff. at 8.)  Babyak viewed Pyszczymuka's questions as "unfocused and ambiguous," so Babyak

asked him if he had specific questions.  (*Id.*)  Pyszczymuka told her that he wanted to know what

---

[2] Babyak did not recall whether it was Kaciban or Pyszczymuka who requested the
debriefing, but did note that on the day of her debriefing, Kaciban informed her that he was
unable to attend.  (Babyak Aff. at 8.)

she thought "about the operation of the Riyadh office." (*Id.*; *see also* Def.'s Ex. 4W

(Pyszczymuka Decl., Apr. 24, 2008) ["Pyszczymuka Decl."] ¶ 7.) Babyak told him that he

needed to trust plaintiff's knowledge of the workings of the office and the "unique" problems it

faced. (Babyak Aff. at 9.)

When SSA Ray returned from Riyadh on December 10, 2001, he sought out Gleicher and

Pyszczymuka to share his unfavorable observations of plaintiff as a "weak administrator."

(Def.'s Ex. R (Ray EEO Aff., May 2, 2003) ["Ray Aff."] at 6-7, 13-14.) While in Riyadh, Ray

told plaintiff that upon his return to Washington, he would inform OIO management that

plaintiff's inattention to administrative details left LEGAT Riyadh in "disarray" and resulted in

many unaddressed investigatory leads, and that the amount of information the Saudis were

providing "was not commensurate" with the amount of time plaintiff spent doing liaison work

with them. (*Id.* at 6-7.) Although Ray shared his observations with Gleicher, and then with

Pyszczymuka at Gleicher's referral, he observed that neither of them expressed much interest in

his report. (*Id.* at 13-14; Def.'s Ex. 5C (Ray Decl., Mar. 28, 2008) ¶ 4.)

## IV.    THE SECURITY INVESTIGATION

Beginning in May 2001, SSA Donovan Leighton, an African-American and former Legat

in Bridgetown, Barbados, was assigned to OIO and assisted UC Gleicher in overseeing LEGAT

offices in the Middle East. (Def.'s Ex. W (Leighton EEO Aff., May 5, 2003) ["Leighton Aff."]

at 2; Pl.'s Facts at 54.) In November 2001, Leighton learned that LEGAT Riyadh needed

assistance and volunteered for duty. (Pl.'s Facts at 56.) Leighton deployed to Riyadh on

November 26. (*Id.* at 57.) During his time there, Leighton made observations and heard reports

that raised concerns about plaintiff's "behaviors . . . which may pose a possible security risk,"

and his failure to manage LEGAT Riyadh "in a manner consistent with the immense equities at

stake particularly in regards to the War Against Terrorism."  (Def.'s Ex. 5E (Leighton EC, Apr.

4, 2002) ["Leighton EC"] at 2.)  Shortly after Leighton's deployment ended on December 21, he

called Gleicher to propose that they speak about Leighton's concerns when he returned to OIO.

(Def.'s Ex. 4F (Leighton Dep., Nov. 28, 2007) ["Leighton Dep."] at 126-28.)  Gleicher did not

offer any comments or instructions in response.  (*Id.* at 128-30.)

      Sometime around January 2002, Leighton began documenting his concerns about

plaintiff.  (Leighton Dep. at 125:12; Leighton Aff. at 15.)  On January 2 through January 7, 2002,

plaintiff exchanged emails with Gleicher and Kaciban regarding communication issues between

OIO management and LEGAT Riyadh and included his views on how to improve their working

relationship.  (Pl.'s Ex. 13.)  On January 10 and 11, an EEO counselor interviewed Gleicher,

Kaciban, and Pyszczymuka about their responses to plaintiff's November 2001 EEO complaint.

(EEO Report at 3-4.)

      After taking personal leave, Leighton returned to OIO on January 14 and continued to

help oversee various LEGAT offices, including Riyadh, as a Desk Officer.  (Def.'s Ex. 5D

(Leighton EC, Jan. 16, 2002); Pl.'s Facts at 58.)  In this capacity, he had further interactions with

plaintiff and ALAT Abdel-Hafiz that heightened his concerns, and he documented these

incidents as well.  (*See* Leighton EC at 5-18; Pl.'s Facts at 54.)  Leighton discussed these issues

with Gleicher, who was "guarded" and did not say much in response.  (Leighton Dep. at 133:16-

18.)

      At some point between January and April 2002, Leighton also had a conversation with

Pyszczymuka about his concerns.[3]  (Leighton Dep. at 135:12-18.)  Leighton wished to proceed

"cautiously" with his "very serious allegation" that plaintiff may pose a security risk, so he spoke

to Dr. Dickson Diamond, the FBI psychiatrist "in charge of EAP," to get his perspective on

plaintiff's observed and reported behavior.  (*Id.* at 138-141; Leighton Aff. at 14-15.)  Dr.

Diamond suggested that some of that behavior did bear on an agent's suitability for foreign

assignment.  (Leighton Aff. at 15.)  Leighton then sent a draft of his EC to Gleicher and

Pyszczymuka, along with the recommendation that his observations about plaintiff and Abdel-

Hafiz be formally referred to the EAP for a "multidisciplinary evaluation."  (Leighton Dep. at

188:5-12; Leighton Aff. at 15.)  The report included observations relating to:

- plaintiff's occasional wearing of Saudi national garb to work, which others reported that plaintiff had received as gifts from the head of the Mabahith;

- reports by others that plaintiff's Mabahith colleagues were attempting to find a suitable wife for plaintiff;

- reports by others that plaintiff had consorted at "wild parties" with female foreign nationals who may have been prostitutes;

- plaintiff and Abdel-Hafiz's apparent lack of involvement with and inattention to the PENTTBOMB investigation, including an especially high-priority investigatory lead;

- plaintiff's purported reluctance or inability to press the Mabahith for assistance with the PENTTBOM investigation;

- plaintiff's extended absence from the Riyadh office for seven weeks from January to March 2002, leaving ALAT Abdel-Hafiz seemingly overwhelmed; and

- plaintiff's purported failure to identify a clear chain of command in the office when he and Abdel-Hafiz left to participate in the Hajj in early 2002, and the fact that at some times during the pilgrimage, their whereabouts appeared to be known only to Mabahith officials who became the office's only way to contact them.

(*See generally* Leighton EC 2-17.)

---

[3] Pyszczymuka offered contradictory accounts of what he told Leighton after hearing Leighton's concerns.  *See* Section II(B)(4)(b), *infra.*

In March 2002, plaintiff – apparently unaware that Leighton was drafting a report about LEGAT Riyadh – exchanged contentious emails with Gleicher, Pyszczymuka, and Kaciban in which he defended his management of LEGAT Riyadh and criticized Leighton's long-distance supervision, in particular Leighton's insistence that plaintiff should allow TDYers to participate in liaison efforts with the Mabahith.  (*See* Pl.'s Exs. 14-16; Def.'s Ex. 5K.)  Plaintiff's March 25 email threatened Pyszczymuka with "an appeal to a higher authority" if Pyszczymuka sided with Leighton and "journey[ed] along [the] destructive path" of second-guessing plaintiff's liaison efforts and judgments regarding the Mabahith.  (Pl.'s Ex. 15 at 1.)  That same email accused OIO management of engaging in a "concerted effort to rebuke [plaintiff] and stymie [his] efforts" for a reason "as obvious as the color of [plaintiff's] skin" and stated that Pyszczymuka should "[r]est assured that [plaintiff] will neither falter nor rest in [his] quest to **fully** exhaust [his] administrative and legal remedies."  (*Id.* at 2 (emphasis in original).)

At some point, Leighton received a note from Acting SC Smith, addressed to Pyszczymuka and Kaciban, in response to Leighton's report:

> I've gone over the EC and think it is much too long, and in some cases, inflammatory and unsupported in fact – innuendo, hearsay, etc.  The exposition – importance of [Saudi Arabia], trading, etc. is unnecessary in light of 9/11/01.  However, there are a number of issues within, other than management.  First and foremost, the allegation of fraternization with [foreign nationals] and sexual relations with same.  Second, this should be paired with Rattigan's response – especially his absence from Legat office for xxx weeks – he seems to justify that in his e-mail.  The rest is a management issue, and we have to live with CG's write up – recent write up[].

> I would suggest that Don does redacted/edited EC to [front office] here, and that we do cover EC and refer to OPR [Office of Professional Responsibility]/Security [Division] for their review.

> /s/ Walt

(Leighton Aff. at 18 (quoting note).)

Sometime around March 26 or shortly thereafter, Pyszczymuka also requested that Leighton change the final paragraph of the EC to state that "SSA Leighton recommends that the above information be referred to the Security Division to conduct an evaluation to determine whether a security risk is presented." (Leighton EC at 18; Leighton Dep. at 218:4-12 (indicating that Pyszczymuka's instruction came about "a few days" or "a week or so" before April 2).) Although Leighton declined to make any of Smith's suggested substantive changes, he did make Pyszczymuka's change to the final paragraph. (Leighton Dep. at 233:15-19, 235:17-236:3.) Leighton did not alter the report to reflect that the recommendation for a security investigation came from Pyszczymuka, and Leighton was not "comfortable" with that fact. (*Id.* at 191:6-15.)

On April 2, 2002, Leighton finalized his report and addressed it to Pyszczymuka and SC Edward Shubert of the Security Division's Personnel Security Section. (*See* Leighton EC at 1; Leighton Dep. at 217:13-15.) The Security Division was formed in early 2002, and its Personnel Security Section is charged with "assur[ing] the loyalty, reliability, suitability, and trustworthiness of applicants, employees, and others who work with, will work with, or have access to sensitive or classified [FBI] information and material." (Def.'s Ex. 3Y ("Life at FBI" webpage) at 1.) On April 12, Pyszczymuka forwarded the Leighton EC with a cover EC addressed to an executive assistant director in the FBI Director's Office, an assistant director in the Office for Professional Responsibility ("OPR"), and SC Shubert. (Def.'s Ex. 5G (Pyszczymuka EC, Apr. 12, 2002) ["Pyszczymuka EC"] at 1.) Pyszczymuka's cover EC stated:

> **Synopsis:** SSA Leighton's observations re Legat Riyadh operations are provided to the Security Division (SD) for review and action deemed necessary by SD.

> **Administrative:** Office of International Operations (OIO) notes that Legat Wilfred Rattigan has commenced an EEO process versus OIO, Section Chief Michael Pyszczymuka, Unit Chief Cary Gleicher, and Deputy Assistant Director Leslie Kaciban. Mr. Michael Coyne of EEOE is presently handling the mediation

process.  Notwithstanding the ongoing process, SC Pyszczymuka requests that SD conduct an appropriate review of SSA Leighton's observations.

**Details:** By EC dated 4/2/02, not uploaded, entitled as captioned, SSA Leighton provides observations of the Legat Riyadh operations based on personal experience and from the perspective gained by virtue of his duties as delineated by the International Operations Unit II, OIO.

> SC Pyszczymuka requests that SD peruse the EC and consider any potential security issues, making the appropriate referrals.

(*Id.*)

The Security Division received and reviewed the Leighton EC.  (Pl.'s Facts at 72-73.) On April 16, 2002, the Security Division advised the Inspection Division of "a number of concerns regarding the nature and extent of the relationship" involving plaintiff, ALAT Abdel-Hafiz, and the Mabahith, and that the Security Division would initiate an investigation of LEGAT Riyadh.  (Def.'s Ex. 5H (Chelak EC, Apr. 16, 2002) at 1-2.)  Due to staffing constraints, the Security Division requested and obtained the Inspection Division's assignment of two assistant inspectors, SSAs Cheryl Tucker and Carlos Cintron, to interview personnel who were assigned to LEGAT Riyadh.  (*Id.* at 2-3; Def.'s Ex. 5I (Tucker EEO Aff., May 1, 2003) at 2-3; Pl.'s Facts at 74.)  Tucker and Cintron began their investigation on or about April 22.  (Pl.'s Facts at 74.)  They reviewed certain emails and interviewed 16 people who had served at LEGAT Riyadh, including ALAT Abdel-Hafiz, SSAs Ray and Leighton, and SAs Taylor and Barghouty.  (Def.'s Ex. 5F (Tucker EC, June 19, 2002) ["Tucker EC"] at 1-2; Pl.'s Facts at 75.) On June 19, 2002, SSA Tucker advised the Security Division that the investigation was complete and the potential security risks observed by Leighton appeared to be "unfounded."  (Tucker EC at 7.)  On September 18, 2002, after conducting a separate review of the evidence collected, the Security Division issued an EC similarly advising that there was "no security risk present relative

to the issues of allegiance, foreign influence, or personal conduct" on plaintiff's part, and that

"[t]he Security Division considers this matter closed."  (Def.'s Ex. 2H (Chelak EC, Sept. 18,

2002) at 4.)

## ANALYSIS

## I.      STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the

pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that

there is no genuine issue of material fact, and that the moving party is entitled to judgment as a

matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A dispute about

a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004)

(quoting *Anderson*, 477 U.S. at 248).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at

255; *see also Wash. Post. Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325

(D.C. Cir. 1989).  The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ.

P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the non-movant fails to point to

"affirmative evidence" showing a genuine issue for trial, *Anderson*, 477 U.S. at 257, or "[i]f the

evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  *Id.* at 249-50 (internal citations omitted).

**II.     RETALIATION**

"To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008).  Plaintiff contends that defendant retaliated against him by undertaking the Finch review, the Gleicher review, the debriefings, and the security investigation.  Defendant argues, *inter alia*, that these four actions were not materially adverse and also offers legitimate, non-retaliatory explanations for them.

The Court previously declined to dismiss these four retaliation claims because (1) the case had not yet proceeded to discovery and there were therefore many unexplored factual issues relating to the circumstances surrounding these alleged investigations, and (2) "the unsettled state of the law" following the Supreme Court's then-recent decision in *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), did not readily suggest whether investigations constituted, as a matter of law, "materially adverse" actions in the retaliation context.  *Rattigan II*, 503 F. Supp. 2d at 76.  Since that time, the parties have conducted extensive discovery and the D.C. Circuit and other courts have articulated their understanding of retaliatory "adverse actions" in general, and investigations in particular.  Having reviewed the extensive record herein, the Court is now able to evaluate plaintiff's remaining claims and grants defendant's motion as to all of plaintiff's retaliation claims except his claim regarding the Security Division's investigation in 2002.

**A.     Governing Law**

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate

against an employee for his "opposition to an unlawful employment practice" or his

"participation in a discrimination charge, investigation, or proceeding." *Burton v. Batista*, 339 F.

Supp. 2d 97, 114 (D.D.C. 2004); *see* 42 U.S.C. § 2000e-3(a).  This "anti-retaliation provision

protects an individual not from all retaliation, but from retaliation that produces an injury or

harm." *Burlington*, 548 U.S. at 67.  The concept of "adverse action" in the retaliation context is

broader than in the discrimination context and can encompass harms unrelated to employment or

the workplace "so long as 'a reasonable employee would have found the challenged action

materially adverse.'" *Baloch*, 550 F.3d at 1198 n.4 (quoting *Burlington*, 548 U.S. at 68).

Whether an action is "materially adverse" is understood in terms of the action's objectively

deterrent effect – *i.e.*, whether it "well might have 'dissuaded a reasonable worker from making

or supporting a charge of discrimination.'" *Burlington*, 548 U.S. at 68 (quoting *Rochon v.

Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)); *accord Steele v. Schafer*, 535 F.3d 689, 696

(D.C. Cir. 2008); *see also Martin v. Gates*, No. 07-CV-513, 2008 WL 4657807, at *10 (D. Haw.

Oct. 20, 2008) (reviewing post-*Burlington* cases and noting that "the court does not focus on

actual harm but on the potential for deterrence").  "The issue of whether a particular employment

action was 'materially adverse' is fact-intensive and 'depends upon the circumstances of the

particular case, and 'should be judged from the perspective of a reasonable person in the

plaintiff's position, considering all the circumstances.'" *Howard v. Gutierrez*, 237 F.R.D. 310,

313 (D.D.C. 2006) (quoting *Burlington*, 548 U.S. at 71).

      "[R]etaliation claims based on circumstantial evidence – like [plaintiff's] – trigger the

familiar burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792

(1973)]." *Jones v. Bernanke*, --- F.3d ---, 2009 WL 564611, at *6 (D.C. Cir. 2009).  However,

where, as here, defendant has asserted "legitimate non-retaliatory explanation[s]" for the

challenged actions, courts must "proceed[] to the ultimate issue of retaliation *vel non* . . . ."[4]  *Id.*

at *7.  "At that stage, the only question is whether the employee's evidence creates a material

dispute on the ultimate issue of retaliation 'either directly by [showing] that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's

proffered explanation is unworthy of credence.'"  *Id.* (quoting *U.S. Postal Serv. Bd. Of*

*Governors v. Aikens*, 460 U.S. 711, 716 (1983)); *accord Brady v. Office of the Sergeant at Arms*,

520 F.3d 490, 494 (D.C. Cir. 2008).

To answer this question, the Court "reviews each of the three relevant categories of

evidence – prima facie, pretext, and any other – to determine whether they 'either separately or

in combination' provide sufficient evidence for a reasonable jury to infer retaliation."  *Jones*,

2009 WL 564611, at *7 (quoting *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 996 (D.C. Cir.

2002)).  Where the "employer's stated belief about the underlying facts is reasonable in light of

the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer

is lying about the underlying facts."  *Brady*, 520 F.3d at 495.  Summary judgment is therefore

appropriate where a defendant "has asserted a legitimate, non-discriminatory reason" for taking

the challenged action, and the plaintiff "does not dispute the factual basis underlying [the]

defendant's explanation," because the plaintiff has "failed to introduce any evidence that would

permit a trier of fact to believe that defendant's proffered rationale for its decision . . . was

pretextual or that its decision was motivated by a retaliatory animus."  *Brantley v. Kempthorne*,

---

[4] However, if a defendant also disputes the existence of a "materially adverse" action, courts may choose to address that issue before proceeding to the question of whether plaintiff has produced enough evidence to show that the actions were retaliatory.  *See Baloch*, 550 F.3d at 1198-1200 (engaging in adversity inquiry first).

No. 06-1137, 2008 WL 2073913, at *7 (D.D.C. May 13, 2008) (granting defendant's motion for summary judgment on retaliation claim), *aff'd*, No. 08-5210 (D.C. Cir. Dec. 23, 2008) (per curiam).  However, where there is evidence of pretext, then even though that evidence would not be "*per se* sufficient to permit an inference of discrimination, it usually will be enough to get a plaintiff's claim [of retaliation] to a jury."  *Jones*, 2009 WL 564611, at *7 (citations, internal quotation marks, and edits omitted).

> **B.      The Challenged Actions**

> **1.      The Finch review**

The Court finds that the Finch review was not materially adverse because it would not have dissuaded a reasonable worker from complaining of discrimination.  Defendant is "entitled to rely on reports of plaintiff's performance given by his immediate supervisor . . . and by others familiar with his work."  *Smith v. Chamber of Commerce of U.S.*, 645 F. Supp. 604, 608 (D.D.C. 1986); *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 149 (D.D.C. 1998) ("An employer is entitled to rely on his perception of an employee's work performance.").  "[C]riticizing [an employee] by written memoranda" in the way that Finch's initial report did "amounts to the kind of 'petty slights or minor annoyances that often take place at work and that all employees experience' and that, consequently, fall outside the scope of the anti-discrimination laws."  *Billings v. Town of Grafton*, 515 F.3d 39, 54 (1st Cir. 2008) (quoting *Burlington*, 548 U.S. at 68).

In the alternative, even assuming *arguendo* that the Finch review was a materially adverse action (which it was not), defendant explains that "the file review that SSA Finch conducted was not an act of retaliation but a self-motivated follow-up to the inspection that LEGAT Riyadh had recently undergone."  (Def.'s Mem. in Supp. of Mot. for Summ. J. ["Mot."]

at 62-63 (citing Finch Dep. at 61:3-12, 93:3-4).)  The record supports the legitimate, non-retaliatory nature of defendant's explanation, and plaintiff has failed to demonstrate that it is pretextual.  Finch testified that he reviewed the prior inspection findings and the backlog of leads and cases on his own initiative, because of his "prior experience" in the OIO and "[w]ithout any prodding" from his superiors.  (Finch Dep. at 35.)  In his former position as a supervisory agent, Finch was "responsible for the assignment of temporary duty personnel" to fill positions in LEGAT offices.  (*Id.* at 15:7-13.)  As part of his briefings to TDYers, he would advise them to "[f]ocus on the last inspection findings of that office to basically do a quick check to see if they were on par to clean them up."  (*Id.* at 16:14-18.)  In other words, Finch previously advised TDYers to do the very same thing that he did when he was assigned as a TDYer to LEGAT Riyadh.  After concluding that there were many "unaddressed leads that [the office] had been responsible for that had not been covered" since the December 1999 inspection report, Finch took it upon himself to document and correct, where possible, the deficiencies he observed.  (*Id.* at 31:1-8, 64:13-21, 94:4-16.)  While his first report was not favorable to plaintiff, Finch spoke with plaintiff at length upon his return to Riyadh, and then he submitted plaintiff's mitigating explanations in a supplemental report that stated plaintiff's performance "was found to be effective and efficient, given the resources assigned to Riyadh."  (2d Finch Report at 2.)  A short time later, plaintiff was promoted and began his tour as Legat.  (*See* Gleicher Report at 2.)

Plaintiff focuses on the fact that a "supervisory" file review (*i.e.*, a formal performance appraisal of an agent) may only be undertaken by the agent's supervisor.  (Opp'n at 51.)  This is beside the point.  Finch's review "was not a routine administrative file review that a supervisor does of a subordinate," but "an outstanding inspection report" that involved "a verification of

whether or not outstanding leads in the [1999] inspection report had been complete[d]."[5]   (Finch

Dep. at 61:2-12.)  Finch initially reviewed the files to familiarize himself with the cases he would

be covering, and when he was unhappy with what he observed, he wrote up his report to

document the "administrative shortcomings" associated with plaintiff's cases and to supplement

the 1999 inspection findings regarding LEGAT Riyadh's problems.  (*Id.* at 46:8-17, 64:19-

65:11;1st Finch Report at 1.)  The title of Finch's reports made clear that it was not a formal

performance appraisal of plaintiff, but an "*Inspection Follow Up* File Review," and both reports

were addressed to Chief Inspector Ragle, who conducted the 1999 inspection.  (1st Finch Report

at 1 (emphasis added).)

Plaintiff does not dispute that when he first requested permission to take a vacation, he

also requested that OIO assign a TDYer to fill in for him.  (Pl.'s Facts at 13-14.)  He also

conceded that Finch did not need his permission to review his case files while covering for him,

and that he knew of no rule prohibiting a review of files for purposes other than performance

appraisals.  (Rattigan Dep. at 4-6, 16:18-17:1.)  Although plaintiff offers significant conjecture

about Finch's motivations, he has given the Court no reason to doubt that Finch legitimately

documented the shortcomings that came to his attention as plaintiff's substitute.  *Cf. Waterhouse

v. Dist. of Columbia*, 124 F. Supp. 2d 1, 10 (D.D.C. 2000) ("Whether plaintiff was solely

responsible for the delays and deficiencies of which defendants complain, or whether she can

explain or justify them, is not the issue.  The issue is whether defendants[] reasonably believed

that plaintiff had performance difficulties in these areas . . . ."), *aff'd*, 298 F.3d 989 (D.C. Cir.

---

[5] Plaintiff also argues that Youssef planned to "use" Finch by incorporating his
unfavorable first report into Youssef's *subsequent* performance appraisal of plaintiff (Opp'n at
17, 82), but even if this were true, plaintiff has not shown that *Finch's review* was undertaken for
improper retaliatory reasons.

2002).  Therefore, in the absence of sufficient evidence to show that defendant's explanation is

actually pretextual, the Court will grant summary judgment as to the Finch review.

### 2.    The Gleicher review

As with the Finch review, the Court finds that the Gleicher review was not materially

adverse because it would not have dissuaded a reasonable worker from complaining of

discrimination.  "An employer should be entitled to discuss and even critique employees about

legitimate job performance problems without being subjected to suit," *Morrison v. Potter*, 363 F.

Supp. 2d 586, 591 (S.D.N.Y. 2005), because Title VII's anti-retaliation provision "was not

intended to immunize insubordinate, disruptive, or nonproductive behavior at work."  *Armstrong

v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981).  Moreover, shortly after Gleicher

finalized his report on LEGAT Riyadh, OIO management extended plaintiff's tour of duty as

Legat, and as plaintiff concedes, Gleicher's review had no "adverse effect" on that extension.

(Rattigan Dep. at 124:16-17.)

In the alternative, even assuming *arguendo* that it was a materially adverse action (which

it was not), defendant explains that Gleicher's October 2001 review of LEGAT Riyadh was part

of a tour of four LEGAT offices in order "[t]o try to make sure that the limited resources

available to OIO were allocated where they most were needed and best could be used . . . ."

(Mot. at 63.)  Accordingly, defendant contends that the on-site review was not retaliation, but

rather that it was "an attempt on the part of the management of OIO to deal as best it could with

the exigencies created by September 11."  (*Id.*)  The record supports this explanation.[6]

---

[6] Plaintiff suggests that defendant's explanation is inconsistent with the explanation for
Gleicher's trip offered by DAD Kaciban on January 10, 2002, as recorded by EEO counselor
Michael Coyne during his interviews with OIO management.  (Opp'n at 83.)  In that report,
Coyne writes that "Kaciban noted that UC Gleicher's visit to Riyadh was not an inspection and
not in response to PENTTBOM.  Rather, it was [OIO's] effort to see how things were working in

First, Gleicher's review was reasonable in light of the fact that FBIHQ was evaluating Riyadh's resource needs on the basis of investigatory lead responses uploaded to ACS, and despite "the huge volume of operation leads set for Riyadh[,] . . . a review of [ACS] revealed only 39 responses."  (Draft Gleicher Report at 2; Gleicher Aff. at 7.)  Even those TDYers who agreed with plaintiff that FBIHQ was insufficiently responsive to plaintiff's characterization of LEGAT Riyadh's needs also recognized the reasonableness of Gleicher's visit and his genuine concern for the office's situation.  For example, SA Babyak had also supported plaintiff's personnel and weapons requests, but still corroborated defendant's need to directly assess Riyadh's operations.  She explained that technical and manpower constraints made it "impossible [for Riyadh] to thoroughly document the work being accomplished in ACS," thus preventing FBIHQ from having "a clear understanding and appreciation of the amount of work Riyadh was handling after September 11."  (Babyak Aff. at 3-5; Def.'s Ex. 4Y (Babyak Dep., Dec. 17, 2007) at 45:8-20, 50:7-15.)  Babyak believed that Gleicher "personally wanted to help," as "evidenced by the fact that he spent a lot of time with [her] to understand the lead situation." (Babyak Aff. at 6-7.)  Indeed, Gleicher's report singled out Babyak for praise and detailed her administrative system for processing leads (*see* Gleicher Report at 4-8), and Babyak noted that a subsequent TDYer to Riyadh "created a database to mimic the system [she] had developed." (Babyak Aff. at 7.)

---

any given Legat office and to make sure that the Legat offices would be ready for future inspections."  (EEO Report at 3.)  Kaciban's reported statement is not, however, inconsistent with defendant's explanation that OIO wanted to review LEGAT offices' resource needs and the FBI's allocation of resources to those offices.  And overall, Kaciban's reported statement is not so inconsistent as to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] reasons that a reasonable factfinder could rationally find them unworthy of credence."  *Edwards v. U.S. E.P.A.*, 456 F. Supp. 2d 72, 91 (D.D.C. 2006) (quoting *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 283 (3d Cir. 2001)).

Similarly, SSA Ray had challenged Gleicher about plaintiff's weapons requests and even assumed partial responsibility for advising plaintiff to allay any suspicions about Gleicher's trip by simply confronting him directly.  (Draft Gleicher Report  at 4-5; Ray Aff. at 5.)  Nonetheless, Ray believed that it was "ridiculously, unspeakably foolish" for plaintiff to claim that Gleicher's visit was discriminatory, because

> [t]he fact that UC Gleicher traveled to Legat Riyadh to conduct an on-site assessment is perfectly acceptable in the ordinary course of business.  It is especially acceptable in light of the fact that the FBI was investigating one of the biggest crises of its time, that SSA Rattigan had expressed his need for assistance, and that *SSA Rattigan had over a thousand outstanding leads regarding this event.* . . . For SSA Rattigan to dictate to Headquarters who comes to his office to perform an assessment is out of line.

(Ray Aff. at 5-6 (emphasis added).)  Ray corroborated defendant's explanation for Gleicher's visit when he attributed plaintiff's conflicts with FBIHQ over resources to the fact that "every other FBI Legat was also requesting additional resources at the same time . . . ."  (*Id.* at 3.)

Second, plaintiff's many arguments for why a reasonable jury could infer a retaliatory motive are unpersuasive.  For example, plaintiff contends that defendant's explanation for Gleicher's visit is pretextual because Gleicher "never responded to any of plaintiff's requests for additional personnel or technical assistance."  (Opp'n at 83.)  This argument is meritless.  On September 26, 2001, plaintiff thanked Gleicher for dispatching TDYers to Riyadh, including Babyak, whom Gleicher sent at plaintiff's specific request over the objections of Gleicher's superiors.  (Def.'s Ex. 4V (Rattigan EC, Sept. 26, 2001) at 1-2; Gleicher Dep. at 143:8-12.)  Plaintiff also ignores that in the eleven months following September 11, OIO management sent 54 agents and 15 support personnel to Riyadh, second only to Islamabad.  (Def.'s Ex. U (chart of TDYers sent overseas for PENTTBOM investigation); *see also* Pl.'s Exs. 11-12 (Gleicher ECs,

Nov. 5 & Dec. 4, 2001); Gleicher Aff. at 6-7.)  As the Court has already noted, because FBIHQ

had to balance increased requests from its offices around the world following the September 11

attacks, "the denial of requests for additional personnel and resources was to be expected . . . ."

*Rattigan II*, 503 F. Supp. 2d at 73.  No inference of retaliation is created by plaintiff's insistence

that Riyadh should have been second to none in the amount of support it received.

Notably, "plaintiff does not dispute the factual basis underlying defendant's

explanations" for FBIHQ's desire to better understand LEGAT Riyadh's needs, *Brantley*, 2008

WL 2073913, at *7, because he does not refute Gleicher, Babyak, or Ray's testimony that

notwithstanding plaintiff's resource requests, FBIHQ reasonably formed its own perception of

the office's needs based on a review of ACS leads.  Plaintiff has therefore not produced

sufficient evidence to "permit a trier of fact to believe that defendant's proffered rationale for its

decision . . . was pretextual or that its decision was motivated by a retaliatory animus." *Id.*

Accordingly, the Court grants defendant's motion as to this issue.

### 3.      The debriefings

The Court finds that the debriefings were not materially adverse.  Plaintiff suggests only

that the debriefings led him to fear that his "career goals" may be in jeopardy, but he points to no

objective evidence that such a fear had a basis in fact.  (Opp'n at 67.)  Purely subjective

perceptions of stigma or loss of reputation are insufficient to make an employer's action

"materially adverse." *See Rattigan II*, 503 F. Supp. 2d at 74.  Further, even though SA Babyak

met with SC Pyszczymuka at the request of OIO management, Babyak responded to

Pyszczymuka's questions "about the operation of the Riyadh office" by speaking *favorably* about

plaintiff and his knowledge of the office's needs.  (Babyak Aff. at 8.)  Plaintiff has not provided

any objective evidence that these debriefings posed any harm that would have dissuaded a reasonable employee from complaining of discrimination.

In the alternative, defendant explains that SA Taylor and SSA Ray's respective conversations with OIO management occurred because these TDYers reached out to Gleicher (who then directed them to Pyszczymuka), and that the conversations were attempts by Gleicher and Pyszczymuka "to maintain an open door for subordinates who wished to speak to them." (Mot. at 64.)  Defendant also explains that Pyszczymuka spoke with Babyak in order to discuss "'the needs of the Riyadh office, to determine whether the office needed additional [TDY] agents, and to ascertain the liaison situation,'" as part of making sure "that an office for which he was responsible functioned as efficiently and effectively as possible."  (*Id.* (quoting Pyszczymuka Decl. ¶ 7).)

The record supports these legitimate, non-retaliatory explanations.  Both Ray and Taylor approached OIO management because of their dissatisfaction with aspects of plaintiff's workplace conduct.  Contrary to plaintiff's contention, no inference of retaliation is created by the mere fact that Taylor was asked if he would *voluntarily* document an incident about which he felt strongly enough to tell OIO management.  As already discussed, "[a]n employer should be entitled to discuss" an employee's "legitimate job performance problems" without risking a lawsuit, *Morrison*, 363 F. Supp. 2d at 591, and defendant is "entitled to rely on reports of plaintiff's performance given . . . by others familiar with his work."  *Smith*, 645 F. Supp. at 608. Nor does the evidence show a retaliatory motive with respect to Ray's conversation with OIO management.  Indeed, even *before* Ray left LEGAT Riyadh, he warned plaintiff that he intended to share with OIO management his many concerns about how plaintiff ran the office.  (Ray Aff.

at 6-7.)  Plaintiff also has failed to show that defendant's explanation for Pyszczymuka's conversation with Babyak was a pretext for retaliation.  Babyak herself stated that the "vague" discussion was *not* "really about" plaintiff, and the only specific questions that Pyszczymuka asked which were related to plaintiff were "about the operation of the Riyadh office," to which Babyak responded by discussing the problems of "long work hours, and a peculiar host government."  (Babyak Aff. at 8-9; Babyak Dep. at 65:8-14.)  Accordingly, the Court grants defendant's motion as to plaintiff's retaliation claims based on these debriefings.

### 4.   The security investigation

In contrast to the prior three claims, the Court concludes that plaintiff has provided sufficient evidence to create a genuine issue of fact as to whether the Security Division's investigation could, by itself, produce an injury or harm that would dissuade a reasonable employee from making or supporting a charge of discrimination.  There is also a "material dispute on the ultimate issue of retaliation," *Jones*, 2009 WL 564611, at *7, because a reasonable jury could conclude that defendant's proffered explanations for the writing of the Leighton EC and its referral to the Security Division are pretextual.

### a)   Materially adverse action

Defendant concedes that "the investigation conducted by the Security Division *was* a formal disciplinary investigation."  (Reply in Supp. of Def.'s Mot. for Summ. J. ["Reply"] at 38 (emphasis in original).)  Courts have found that disciplinary or other investigations can constitute materially adverse actions that would support a retaliation claim.  *See, e.g.*, *Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006) (reversing dismissal of FBI employee's allegation of retaliation by means of OPR investigation); *Billings*, 515 F.3d at 54-55 (finding that

investigation and other actions could, "by their nature," deter employee from complaining of

discrimination); *Freitag v. Ayers*, 468 F.3d 528, 542 n.7 (9th Cir. 2006) (finding harmless error

in jury's pre-*Burlington* retaliation instruction because jury would likely still have found that

defendant's internal affairs investigation of plaintiff was materially adverse); *Rodriguez v. City*

*of Laredo*, No. 06-CV-175, 2007 WL 2329860, at *3 (S.D. Tex. Aug. 13, 2007) (finding that

investigation could be materially adverse under *Burlington* and noting that "petty workplace

incivilities must be distinguished from employer harassment achieved through the summoning of

overbearing institutional power").  However, defendant argues that the Security Division's

investigation would not have dissuaded a reasonable worker in plaintiff's position from

complaining of discrimination, because "the investigation lacked the indicia of threat that loyalty

investigations often have," as plaintiff felt no effects "during the pendency of the investigation."

(Reply at 38.)  This argument is unpersuasive both as a matter of law and in light of the evidence

presented.

        Under *Burlington*, the touchstone for "material adversity" is deterrence.  *See* 548 U.S. at

68 (noting that function of anti-retaliation provision is to "prohibit[] employer actions that are

*likely to deter* victims of discrimination from complaining to the EEOC, the courts, and their

employers" (internal quotation marks omitted; emphasis added)); *see also id.* at 77 (Alito, J.,

concurring in the judgment) (criticizing majority opinion's emphasis on deterrence).  The

language in *Burlington* regarding whether an action "well might have 'dissuaded a reasonable

worker from making or supporting a charge of discrimination'" is taken directly from the D.C.

Circuit's decision in *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quoting

*Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).  *See Burlington*, 548

U.S. at 68.  In *Rochon*, the challenged "action" was actually an employer's *inaction* that raised

the prospect of uncertain and unrealized consequences – namely, "the FBI's refusal, contrary to

policy, to investigate death threats" made by a federal prisoner against plaintiff and his wife.  438

F.3d at 1213.  The analysis in *Rochon* looked only at whether "a reasonable FBI agent" would

have been dissuaded from complaining of discrimination "if he knew that doing so would leave

him unprotected by the FBI *in the face of threats* against him or his family."  *Id.* at 1219

(emphasis added).  Taken together, *Burlington* and *Rochon* indicate that whether an action is

"materially adverse" is determined by whether it holds a deterrent *prospect* of harm, and not by

whether the harm comes to pass or whether any effects are felt in the present.[7]  *See, e.g.*,

*Velikonja*, 466 F.3d at 124 ("a reasonable jury could find that the *prospect* of such an

investigation could dissuade a reasonable employee from making or supporting a charge of

---

[7] Defendant incorrectly suggests that this Court's decision in *Sewell v. Chao*, 532 F. Supp. 2d 126 (D.D.C. 2008), *aff'd sub nom. Sewell v. Hugler*, No. 08-5079, 2009 WL 585660 (D.C. Cir. Feb. 25, 2009) (per curiam), supplemented the *Burlington* standard with a requirement that a plaintiff must show that the allegedly retaliatory action had "adverse consequences."  (*See* Reply at 28.)  The *Sewell* plaintiff claimed retaliation under the analogous provision of the Age Discrimination in Employment Act ("ADEA") and argued that her new assignments "amounted to a 'tangible change in [her] duties or working conditions constituting a material employment disadvantage.'"  532 F. Supp. 2d at 136 (quoting plaintiff's opposition).  The Court's note that plaintiff "failed to allege any adverse consequences, or even any changes, resulting from her transfer" to a different department, *id.* at 137, was simply a reference to the only type of harm that plaintiff herself had articulated.

Another judge on this Court held in *Ginger v. District of Columbia* that "[t]he mere initiation of an investigation into a plaintiff's conduct is not an adverse *employment action* when it has *no effect on the plaintiff's employment*," and thus rejected the plaintiffs' retaliation claim based on investigations into their workplace conduct because "none of the investigations . . . resulted in discipline or suspension." 477 F. Supp. 2d 41, 53 (D.D.C. 2007) (emphasis added). This Court respectfully disagrees with that reasoning because it employed pre-*Burlington* standards.  Moreover, although the D.C. Circuit affirmed *Ginger*'s rejection of the investigation claim, it did so on different grounds: all of the retaliation allegations (except for one related to weekend work schedules) were too "vague" to merit consideration, "and even those that should have left a paper trail [were] *unsupported by any documentary evidence*."  527 F.3d 1340, 1347 (D.C. Cir. 2008) (emphasis added).

discrimination" (emphasis added)); *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087-91

(10th Cir. 2007) (a former employer's threats to spread rumors about plaintiff's sexual conduct

and submission of false accusations to state agency when contesting her unemployment benefits

were materially adverse actions, even though there was no evidence that her benefits were ever

actually interrupted or suspended); *Billings*, 515 F.3d at 54-55 ("An employee who knows that . .

. she *risks* a formal investigation and reprimand . . . might well choose not to proceed with the

litigation in the first place." (emphasis added)); *Slater v. Town of Exeter*, No. 07-CV-407, 2009

WL 737112, at *9-*10 (D.N.H. Mar. 20, 2009) (citing cases and noting that "a threat, depending

on its severity, could constitute retaliation" through its "deterrent effect"); *Walsh v. Irvin Stern's*

*Costumes*, No. 05-CV-2515, 2006 WL 2380379, at *2 (E.D. Pa. Aug. 15, 2006) ("[A] threat to

accuse [plaintiff] of a criminal offense could certainly be construed as 'materially adverse' to

her."); *Doucet v. Univ. of Cincinnati*, No. 05-CV-148, 2006 WL 2044955, at *22 n.19 (S.D.

Ohio July 19, 2006) ("The initiation of a formal disciplinary investigation – even one that does

not result in formal discipline – would satisfy [*Burlington*'s] standard."), *aff'd on other grounds*,

No. 06-4118, 2007 WL 2445993, at *9 (6th Cir. Aug. 28. 2007); *O'Neal v. State Univ. of New*

*York*, No. 01-CV-7802, 2006 WL 3246935, at *13 (E.D.N.Y. Nov. 8, 2006) (citing *Doucet* and

finding that a letter notifying plaintiff that she was the subject of a disciplinary investigation

constituted materially adverse action); *cf. Steele*, 535 F.3d at 696 (noting that "a false report to

government authorities can constitute retaliation" and that plaintiff's allegation that defendant

sent false report contesting her unemployment benefits to D.C. unemployment office "involve[d]

conduct" that could support retaliation claim).[8]

---

[8] In *Steele*, the D.C. Circuit pointed to *Burlington*'s approving citation of *Berry v.
*Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996), which found "actionable retaliation where
[an] employer filed false criminal charges against [a] former employee who complained about

Of course, plaintiff's purely *subjective* perception that the Leighton EC and resulting security investigation jeopardized his "career goals" does not make defendant's actions materially adverse.  (Opp'n at 67.)  *See Rattigan II*, 503 F. Supp. 2d at 74.  Rather, plaintiff must provide evidence that the security investigation posed an *objective* harm to his reputation or prospects.  *See Billings*, 515 F.3d at 54 (noting that "reduced prestige in the objective sense, not merely in [plaintiff's] subjective opinion," could make action materially adverse); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 613 nn. 6 & 7 (5th Cir. 2007) (distinguishing "subjective" perceptions of stigma or loss of prestige, which cannot establish adversity, from "objective" stigma or loss of prestige, which can); *see also Burlington*, 548 U.S. at 71 (relying on objective indicators of "prestige" when determining whether plaintiff's reassignment was materially adverse).  The D.C. Circuit echoed this concern for objective harms to reputation and employment prospects in *Passer v. American Chemical Society*, 935 F.2d 322 (D.C. Cir. 1991) (applying Title VII's retaliation analysis to claim under parallel provision of Age Discrimination in Employment Act); *see also Rochon*, 438 F.3d at 1218 (endorsing *Passer* as consistent with deterrent function of Title VII's anti-retaliation provision).  In *Passer*, the D.C. Circuit held that plaintiff properly alleged an adverse retaliatory action where he claimed that his former employer cancelled a symposium in his honor and thereby "humiliated him before the assemblage of his professional associates and peers from across the nation, and made it more difficult for him to procure future employment."  935 F.2d at 331.  *Cf. Velikonja*, 466 F.3d at 124 (finding valid allegation that FBI investigation was retaliatory where, in addition to preventing

---

discrimination."  *Steele*, 535 F.3d at 696 (quoting *Burlington*, 548 U.S. at 64).  Consistent with *Burlington* and *Rochon*'s focus on the deterrent prospect of harm, the *Berry* court reached its conclusion because the institution of criminal charges and the public trial "carr[ied] a significant *risk* of humiliation, damage to reputation, and a concomitant harm to future employment prospects."  74 F.3d at 986 (emphasis added).

31

plaintiff from receiving promotions while investigation was pending, plaintiff also claimed that it

"placed a cloud over [her] career, which effectively prevent[ed] her from obtaining other career-

enhancing assignments for which she is highly qualified").

    Here, there is evidence that the security investigation posed an objective threat to

plaintiff's career, such that a jury could find that the investigation was "materially adverse."

DAD Kaciban affirmed that an allegation that an FBI agent was a security risk, particularly an

agent "in such a sensitive assignment as Riyadh," is a "very serious allegation" with "potentially

devastating effects" on that agent's career.  (Def.'s Ex. 4A (Kaciban Dep., Jan. 9, 2008)

["Kaciban Dep."] at 137:12-19.)  SSA Tucker, who conducted the security investigation, also

affirmed that "an investigation of an agent of the FBI as a security risk" is a "very serious

matter" that could "derail [his] career," possibly *even if* the investigation was "unsubstantiated."

(Def.'s Ex. 5J (Tucker Dep., Dec. 12, 2007) at 77:20-78:5.)  SSA Leighton similarly

acknowledged the seriousness of his suggestion that plaintiff might pose a security risk.  (*See*

Leighton Dep. at 138:9-22.)  Accordingly, Leighton deliberated extensively about whether to

report his observations, even seeking an opinion from the head of EAP about whether those

observations merited reporting.  (*Id.* at 138-141; Leighton Aff. at 15-16.)  Trying to be "as

careful as possible in what [he] said, in fairness" to plaintiff and ALAT Abdel-Hafiz, Leighton

concluded that he would only report his concerns to EAP with a recommendation that a

"multidisciplinary evaluation" be conducted, because "[i]t wasn't [his] intent to precipitate a

[S]ecurity [D]ivision investigation."  (Leighton Dep. at 187-88.)  Although he changed his

recommendation at OIO management's behest, he was not "comfortable" with it.  (*See id.* at

191:6-15.)  Given that the potential harm to *plaintiff's* career apparently deterred *Leighton* from

referring the matter to the Security Division until OIO management instructed him to do so, a jury could conclude that the investigation would have deterred a reasonable employee from complaining of discrimination, and that it was therefore a materially adverse action.[9]

**b)**      **Pretext**

Plaintiff contends that there are genuine factual disputes over "how involved Pyszczymuka and OIO management" were in the writing of the Leighton EC and "whether it was OIO management, and not Leighton, who was the moving force behind the security investigation." (Opp'n at 37.) Based on the record herein, the Court agrees that a reasonable jury could conclude that defendant's explanations regarding the writing of the Leighton EC and its referral to the Security Division are not worthy of credence.

Leighton testified that he had a single conversation with Pyszczymuka about plaintiff and LEGAT Riyadh, during which he told Pyszczymuka, "Listen, you've got to deal with this." (Leighton Dep. at 135:12-21.) Defendant concedes that Leighton voiced his concerns to Pyszczymuka but denies that Pyszczymuka "gave any encouragement" to Leighton. (Mot. at 50.) Defendant points to Pyszczymuka's 2008 declaration, which states:

> When Supervisory Special Agent (SSA) Donovan Leighton returned from his temporary-duty assignment in Riyadh, he approached me to discuss his observations and concerns about Plaintiff. SSA Leighton informed me that he wanted to prepare an electronic communication documenting his observations and concerns. I told SSA Leighton that he should do whatever he felt was appropriate under the circumstances. *I did not direct SSA Leighton to document his observations of Plaintiff.*

---

[9] Plaintiff also contends that the security investigation played a role in the later December 2002 denial of his request to extend his time as Legat. (Opp'n at 43-46.) *See Rattigan I*, 2006 WL 4916613, at *1 (dismissing claims related to that denial for failure to exhaust). Because there is already sufficient evidence from which a reasonable jury might conclude that the *threat* to plaintiff's career made the investigation "materially adverse," there is no reason to decide whether the investigation *actually* damaged his career.

33

(Pyszczymuka Decl. ¶ 8 (emphasis added); *see* Mot. at 50 (quoting declaration).)  However, the

final sentence above is contradicted by Pyszczymuka's 2003 EEO affidavit, where he states:

> I know that after SSA Donovan Leighton returned from a TDY to Riyadh, he was
> concerned about SSA Rattigan and whether the personal relationships that he had
> with the Saudis was affecting SSA Rattigan's professional work.  If SSA
> Leighton felt so strongly about his concerns, *I told SSA Leighton to document
> these concerns in an E.C., forward the document to me,* and I in turn forwarded
> the E.C. to the Security Division (SD).

(Def.'s Ex. X (Pyszczymuka EEO Aff., Apr. 16, 2003) ["Pyszczymuka Aff."] at 8 (emphasis

added).)

This inconsistency in Pyszczymuka's explanations is sufficient to create a genuine

dispute of material fact, because it would, if true, undermine defendant's legitimate, non-

retaliatory explanation for the genesis of the security investigation.  Defendant explains that the

investigation was set in motion by the Leighton EC, which Leighton, without "any

encouragement" from Gleicher or Pyszczymuka, drafted "solely" because he wanted to report his

concerns about a possible security risk.  (*See* Mot. at 49-50.)   A reasonable jury could, however,

conclude that Pyszczymuka's statement that "I told SSA Leighton to document these concerns in

an E.C." *supports* plaintiff's allegation that the Leighton EC was written at the behest of OIO

management (an allegation that defendant spends many pages contesting (*see* Reply at 21-28))

and *contradicts* defendant's contention that Pyszczymuka did not give Leighton "any

encouragement."  (Mot. at 50.)  In light of the EEO proceedings and interviews that were

ongoing in early 2002, a reasonable jury could therefore find that defendant's proffered

explanation for the writing of the Leighton EC is a pretext for retaliation.

Pyszczymuka's 2003 affidavit also creates a genuine issue of material fact regarding the

credibility of defendant's explanation for Pyszczymuka's forwarding of the Leighton EC to the

Security Division.  Defendant explains that it was appropriate because Leighton made allegations of a security risk and then presented those allegations to Pyszczymuka, which left Pyszczymuka duty-bound to report those allegations "to the proper authorities for investigation."  (Mot. at 65.)  If a reasonable jury credited Pyszczymuka's 2003 affidavit, the jury could also conclude that defendant's explanation for the referral was a pretext for retaliation in light of the circumstances surrounding the referral.

Leighton testified that it "wasn't [his] intent to precipitate a [S]ecurity [D]ivision investigation," and that he believed EAP was "in the best position to evaluate the situation" through a "multidisciplinary evaluation."  (Leighton Dep. at 187:3-6, 188:10-12.)  He only "suspected," but apparently did not "believe," that plaintiff posed a possible security risk and therefore did not want to refer his concerns to the Security Division, because he "wanted to be as careful as possible in what [he] said, in fairness" to plaintiff.  (*Id*. at 188:13-21.)  According to Pyszczymuka's 2003 statement, once Pyszczymuka learned of Leighton's concerns, he told Leighton to document those concerns and forward the report to him.  But according to Kaciban, "anybody in the FBI, even a support person," could directly report his or her concerns about a security risk with the Security Division without going through a supervisor or chain of command and without obtaining "anybody's approval."  (Kaciban Dep. at 144:4-10.)  Therefore, Pyszczymuka's apparent instruction that Leighton should forward the EC to him arguably served no valid administrative function.

Also, on March 25, 2002, plaintiff sent Pyszczymuka a lengthy email that apparently accused OIO management of discriminating against plaintiff on the basis of his race and put Pyszczymuka on notice that plaintiff would "**_fully_** exhaust [his] administrative and legal

remedies" regarding his belief that defendant had discriminated against him.  (Pl.'s Ex. 15 at 2

(emphasis in original).)  Pyszczymuka responded that same day, stating: "Legat Rattigan: Your

E-mail has been noted.  Thanks, Mike."  (*Id.* at 1.)  Leighton testified that sometime around

March 26 or shortly thereafter, Pyszczymuka instructed Leighton to change the EC's ultimate

recommendation of an EAP referral for a multidisciplinary evaluation into a Security Division

referral for a security investigation.  (Leighton Dep. at 188:5-12, 196:13-19, 218:4-12 (indicating

that Pyszczymuka's instruction came about "a few days" or "a week or so" before April 2).)

Leighton made the change solely to "comply[] with senior management's instructions," even

though it did not reflect his actual recommendation.  (*Id.* at 189:7-10 ("Q: In any event, you put

something in the document saying that you recommended something that you didn't recommend,

correct?" "A: Yes."), 189:19-20.)  Leighton was not "comfortable" with the fact that the report

did not indicate that his recommendation for a security investigation was made at the behest of

OIO management, but he did not discuss the issue with Pyszczymuka.  (*Id.* at 191:56-15, 196:20-

197:2.)  Leighton finalized his report on April 2 and addressed it to Pyszczymuka and SC

Shubert of the Security Division.  Pyszczymuka then forwarded the Leighton EC on April 12 to

Shubert, as well as to the Director's Office and the Office of Professional Responsibility, stating

that the report contained "*Leighton's observations* of the Legat Riyadh operations based on

*personal experience* and from the *perspective gained by virtue of his duties*," but without stating

that OIO management had told Leighton to recommend that plaintiff's behavior warranted a

Security Division investigation.  (Pyszczymuka EC at 1 (emphasis added).)

Based on this evidence, including the inconsistency created by Pyszczymuka's 2003

affidavit and the sequence of events, there is "a genuine issue of material fact regarding the

credibility of the FBI's explanation for its decision" to initiate the security investigation, thereby "rendering summary judgment on the pretext question improper." *Desmond v. Mukasey*, 530 F.3d 944, 947 (D.C. Cir. 2008).  The Court must heed the D.C. Circuit's admonition that evidence of pretext "[u]sually . . . 'will be enough to get a plaintiff's claim to a jury.'" *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (quoting *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999)); *accord Jones*, 2009 WL 564611, at *7; *see also Brady*, 520 F.3d at 496 n.4 ("[D]iscrediting an employer's asserted reason is often quite probative of discrimination." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). "Although a jury may ultimately decide to credit the version of the events described by [defendant] over that offered by [plaintiff], this is not a basis upon which a court may rest in granting a motion for summary judgment." *George*, 407 F.3d at 413.  For this reason, the Court will deny defendant's motion as to plaintiff's retaliation claim based upon the security investigation.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [Dkt. # 61] is denied with respect to the security investigation, but granted in all other respects.  A separate order accompanies this Memorandum Opinion.

**SO ORDERED.**

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:   March 30, 2009