# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**WILFRED SAMUEL RATTIGAN,**             )
                                        )
    **Plaintiff,**      )
                                        )
    **v.**             )    **Civil Action No. 04-2009 (ESH)**
                                        )
**ERIC H. HOLDER,**                      )
**Attorney General,**                    )
                                        )
    **Defendant.**      )
_____ )

## MEMORANDUM OPINION

FBI agent Wilfred Rattigan filed suit alleging discrimination based on race, national origin, and religion; retaliation; and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). After extensive motions practice, a single retaliation claim remained. Following a jury verdict in plaintiff's favor on that retaliation claim, defendant appealed arguing that "plaintiff's claim [wa]s nonjusticiable under Supreme Court and D.C. Circuit case law. . . ." *See Rattigan v. Holder*, 643 F.3d 975, 977 (D.C. Cir. 2011) ("*Rattigan I*"). The Court of Appeals vacated and remanded the case. Following rehearing, the Court of Appeals affirmed its decision to vacate and remand, but narrowed its ruling on the legal standard. *See Rattigan v. Holder*, 689 F.3d 764, 773 (D.C. Cir. 2012) ("*Rattigan II*").

The defendant has now filed a motion for summary judgment. (*See* Def.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Mot.") [ECF No. 146-1].) Plaintiff opposes this motion, or in the alternative, seeks additional discovery pursuant to Fed. R. Civ. P. 56(d). (Pl.'s Mem. of Law in Opp'n to Def.'s Post-Appeal Mot. for Summ. J. ("Opp.") [ECF No. 150].) At this

juncture, the Court must decide whether to: (1) grant defendant's motion for summary judgment, (2) deny defendant's motion for summary judgment and proceed to trial, or (3) permit further discovery prior to ruling on defendant's motion for summary judgment. Based on a thorough examination of the record and for the reasons stated below, the Court concludes that Rattigan's case cannot go forward without putting the jury in the position of second-guessing the Security Division's decision to initiate an investigation, and therefore, summary judgment will be granted.

## BACKGROUND

### I.    FACTS

The material facts relevant to this case were described in detail in this Court's prior opinions and the two opinions of the Court of Appeals. *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 62-65 (D.D.C. 2007); *Rattigan v. Holder*, 604 F. Supp. 2d 33, 37-45 (D.D.C. 2009); *Rattigan v. Holder*, 636 F. Supp. 2d 89, 90-91 (D.D.C. 2009); *Rattigan I*, 643 F.3d at 965-68; *Rattigan II*, 689 F.3d at 765-67. Therefore, an abbreviated version of the facts focused primarily on plaintiff's remaining retaliation claim will suffice.

In 1999, the FBI assigned Rattigan to the Office of the Legal Attaché at the United States Embassy in Riyadh, Saudi Arabia. *Rattigan*, 604 F. Supp. 2d at 38. He served there until July 2003, first as an Assistant Legal Attaché and then as a Legal Attaché. *Id.* During this time, Rattigan—who is a black male of Jamaican decent and convert to Islam—participated in the Muslim holy pilgrimage to Mecca known as the Hajj. *Id.* at 42. After Rattigan was promoted to the position of Legal Attaché, his immediate supervisor was Cary Gleicher, a Unit Chief in the FBI's Office of International Operations ("OIO"). *Rattigan I*, 643 F.3d at 978. Gleicher's supervisor was Michael Pyszcymuka, an OIO Section Chief, and Pyszcymuka's supervisor was Leslie Kaciban, Deputy Assistant Director of OIO. *Id.* In October 2001, Rattigan filed a report

with the Equal Employment Opportunity (EEO) Office for discrimination based on race and national origin. *Id.*

In late November 2001, Cary Gleicher assigned Donovan Leighton to a temporary detail in the Riyadh Office of the Legal Attaché.   During his brief tenure in Riyadh, Leighton "became concerned about Rattigan's behavior and management of the office." *Id.* Upon returning to Washington, Leighton was assigned to be an interim desk officer for the legal attaché offices in Pakistan and the Middle East, including the Riyadh office.   During this time, Leighton's interactions with Rattigan heightened his suspicions, "especially given the importance of Rattigan's office to the FBI's mission in light of the September 11, 2001 terrorist attacks." *Id.*

Leighton voiced his worries to Gleicher who told him to bring them to Pyszcymuka's attention.  (*See* 7/24/2009 AM Trial Tr. at 36.) Pyszcymuka then met with Leighton for between an hour and an hour and fifteen minutes.  (*See* 7/27/2009 PM Trial Tr. at 60.) During this conversation, Pyszcymuka did not ask Leighton if he had proof of his allegations. (*Id.*)  In late January 2002, Leighton began drafting an internal FBI memorandum (referred to as an "EC" or electronic communication) detailing his concerns.  *Rattigan I*, 643 F.3d at 978.  In March 2002, Leighton completed a draft of the EC and gave it to Pyszcymuka.  *Id.* at 979.  Pyszcymuka forwarded this draft to his assistant, Walter Smith, for his review.  (*See* Pl.'s Trial Ex. 17.) After reviewing the document, Smith returned the draft to Pyszcymuka with handwritten comments, as well as a note explaining to Pyszcymuka that "the EC . . . is much too long, and in some cases, inflammatory and unsupported by fact-innuendo, hearsay, etc. . . . [T]here are a number of issues within, other than management.  First and foremost, the allegation of fraternizations with FNs [Foreign Nationals] and sexual relations with the same." *Id.*  Pyszcymuka returned the draft

to Leighton with Smith's comments, as well as a note instructing him to "[p]lease review the Draft E.C. and . . . [l]et's focus on management matters and potential security concerns that may exist in Riyadh." (*See* Pl.'s Trial Ex. 18.) After making corrections to the document, Leighton gave the final eighteen-page EC to Pyszcymuka. Pyszcymuka referred the document directly to the Security Division on April 12, 2002, without independently investigating its accuracy. (*See* Pl.'s Trial Ex. 20; 7/27/2009 PM Trial Tr. at 20.) Plaintiff conceded in his deposition and at trial that Pyszcymuka had no first-hand knowledge of the facts in the EC and that Pyszcymuka believed the allegations in the EC to be true. (*See* 7/27/2009 PM Trial Tr. at 20; Def.'s Ex. J, Rattigan Dep., Dec. 7, 2007, at 195.)

The primary allegations in the EC were that: (1) Rattigan wore traditional Saudi attire to the office which he had received as a gift from the Saudi security service (the Mabahith); (2) Rattigan's Mabahith colleagues attempted to identify a "suitable wife" for him; (3) while participating in the Hajj, Rattigan could only be contacted through Mabahith officers; (4) Rattigan was inattentive to the FBI's investigations of the September 11 attacks; (5) Rattigan hosted wild parties attended by other agents which included "nurses," a term that "might have be[en] used by . . . Rattigan as a euphemism for 'prostitutes'"; (6) Rattigan refused to allow temporary special agents to contact the Mabahith directly. *See Rattigan I*, 643 F.3d at 978-79.

After reviewing the EC, Edward Shubert of the Security Division authorized a security investigation. *Id.* at 979. Shubert testified at trial that the primary reasons for commencing this investigation were "undue foreign influence" and "personal conduct." (7/27/2009 AM Trial Tr. at 31.) At the conclusion of the investigation, the Security Division determined that Rattigan presented "no security risk . . . [resulting from] allegiance, foreign influence, or personal conduct. . . ." *Rattigan I*, 643 F.3d at 979.

## II.   PROCEDURAL HISTORY

### A.  District Court

Over the course of this prolonged litigation, the Court has issued three opinions dismissing or granting summary judgment on all of plaintiff's claims except one: "Rattigan's contention that the FBI retaliated against him for complaining that OIO officials had discriminated against him on the basis of his race and national origin by subjecting him to a security clearance investigation." *Id.* (internal quotation marks and citation omitted).  On the eve of trial, defendant moved to dismiss the case on the ground that the district court lacked the authority to adjudicate this claim because it impermissibly called into question the Security Division's decision to investigate Rattigan.  This Court denied that motion.  *Rattigan*, 636 F. Supp. 2d at 95.

The Court then conducted a seven-day jury trial.  After deliberations, the jury returned a verdict for the plaintiff.  The jury specifically found that (1) plaintiff had "proven by a preponderance of the evidence that the initiation of the investigation by the FBI's Security Division was a materially adverse action" and (2) "the reason that defendant initiated the FBI's Security Division Investigation was to retaliate against plaintiff for having engaged in protected activity. . . ." (*See* Verdict Form [ECF No. 108].) The jury awarded plaintiff $400,000 in compensatory damages.  *Id.* This Court denied the government's post-trial motions.  (Order, Nov. 16, 2013 [ECF No. 124]).  The government appealed on justiciability grounds.

### B.  *Rattigan I*

On June 3, 2011, in a two-to-one panel decision, the Court of Appeals vacated the district court judgment and remanded the case for further proceedings. *Rattigan I*, 643 F.3d at 989. Specifically, the Court of Appeals held that the jury's decision violated the Supreme Court's

holding in *Department of the Navy v. Egan*, 484 U.S. 518 (1988). 643 F.3d at 984-85. In *Egan*, the Court held that only the Executive Branch has the constitutional authority "to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information." 484 U.S. at 527. Since this decision, the D.C. Circuit and other circuits have held that *Egan* "applies to Title VII claims and bars judicial resolution of 'a discrimination claim based on an adverse employment action resulting from an agency security clearance decision.'" *Rattigan I*, 643 F.3d at 981 (quoting *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999)).

Based on *Egan* and its progeny, the Court of Appeals held that "the district court's evidentiary rulings, jury instruction, and verdict form" impermissibly placed the jury in the position of second-guessing the Security Division's decision to investigate Rattigan. *Id.* at 985. In the Court of Appeal's words, "the district court expressly recognized that Security Division Section Chief Edward Shubert had become the relevant 'decision maker'" and the jury instructions and verdict form impermissibly "invited" the jury to "look into Shubert's decision-making process and assess his reasons for authorizing the investigation." *Id.*

Yet, the Court of Appeals refused to dismiss the case.[1] Instead, the Court held that the referral itself could constitute a materially adverse action. In order to succeed on such a claim, the Court held that plaintiff would need to show that the reasons proffered by the government for the referral were pretextual. *Id.* at 988 ("[T]he plaintiff may be able to introduce evidence to convince the jury that those employees included in their referral accusations that they knew or

---

[1] Judge Kavanaugh argued for dismissal on the grounds that "[t]he majority opinion's slicing and dicing of the security clearance process into reviewable and unreviewable portions is nowhere to be found in *Egan*, and does not reflect the essential role that the reporting of security risks plays in the maintenance of national security." *See* 643 F.3d at 989-90.

should have known were false or misleading. Such evidence, if credited, will provide compelling reasons for the factfinder to conclude that the employees' asserted security reasons for the referral were pretextual without ever calling into doubt any Security Division judgment.") In other words, a jury would need to conclude that defendant knew or should have known that the information in the referral was false. The Court of Appeals then left it to this Court to decide whether "Rattigan's case c[ould] go forward without putting the jury in the position of second-guessing the Security Division." *Id.* at 989.

## C. *Rattigan II*

Following *Rattigan I*, the government filed for rehearing and rehearing *en banc*. On September 13, 2011, the Court of Appeals granted the motion for rehearing. After additional argument, the Court of Appeals affirmed its earlier opinion (with Judge Kavanaugh again dissenting) on narrower grounds. *Rattigan II*, 689 F.3d at 773. The Court held that it was not sufficient for a jury to find that the stated reasons for the referral were pretextual. Rather, the defendant would only be liable for retaliation if a jury determined that a relevant actor referred knowing falsities to the Security Division. *Id.* at 770. In reaching this conclusion, the Court emphasized that its prior decision could discourage critical reporting "by permitting jurors to infer pretext based on their own judgments that the information reported was either unlikely to prove true or raised insufficiently weighty security concerns," and as such, it "conflict[ed] with Executive Order 12,968's expectation that employees will report even overheard rumors or small details that may ultimately prove irrelevant." *Id.* at 769.[2]

---

[2] Section 6.2(b) states that employees with security clearances "are encouraged and expected to report any information that raises doubts as to whether another employee's continued eligibility for access to classified information is clearly consistent with the national security." Exec. Order No. 12,968, § 6.2(b), 60 Fed. Reg. at 40,253.

Under this new standard, the only permissible question for the jury is "whether the reporting employee *actually knew* at the time of the reporting that the information he provided was *actually false*." *Rattigan II*, 689 F.3d at 770 (emphasis added).  In support of this new rule's adoption, the Court reasoned that "the Security Division cannot possibly be assisted by employees who knowingly report false information—that is, outright lies—about fellow employees." *Id.* At the same time, such a standard "create[s] no conflict with Executive Order 12,968's broad reporting mandate." *Id.* at 771.  Moreover, it "would obviate any need for jurors to 'weigh the strength' of the information reported." *Id.* at 770.

Both parties argued that under this newly announced knowingly false standard further proceedings were unnecessary.  *Id.* at 771-72.  The Court of Appeals disagreed.  The Court acknowledged that many of the allegations in the EC were not knowingly false, but were based on facts that were largely uncontested.  Specifically, the Court of Appeals held that the following allegations in the EC were true: (1) that Rattigan wore traditional Saudi clothing to the embassy; (2) that he restricted interactions between temporary American staff and Saudi intelligence; (3) that the Saudi intelligence service sought to find him a suitable wife; and (4) that he could only be contacted through Saudi intelligence while participating in the Hajj.  *Id.* at 772.

That said, the Court of Appeals also held "that there may be evidence to support a claim that Leighton or other OIO officials chose to report other information that they knew to be false.  For example, Leighton's EC states that Rattigan hosted wild parties attended by so-called 'nurses' who Leighton claims were described in a manner suggesting that the term 'nurses' was being used by [] Rattigan as a euphemism for 'prostitutes.'"  *Id.* (internal citations omitted).  In support of his claim the Court cited Rattigan's contention that it was widely known by Rattigan's co-workers, including OIO staff, that he dated and eventually married a woman who was a nurse.

*Id.* at 772-73. Given this, Rattigan argues that Leighton and his supervisors knew that the suggestion that nurses might have been prostitutes was false. *Id.* The Court therefore affirmed its prior decision to vacate and remand the case to district court.

The Court of Appeals provided the following detailed instructions to this Court for its consideration on remand:

> At this stage, we have no need to determine whether the record evidence is sufficient to allow a reasonable jury to conclude that Leighton or his OIO supervisors knowingly reported or referred false factual allegations to the Security Division. Because we set forth this knowingly false standard for the first time on appeal, Rattigan had little reason to thoroughly develop evidence of knowing falsity in the district court. Given this, and given that the record contains some evidence that could form the basis for a claim of knowingly false security reports, we shall remand for the district court, after permitting any necessary discovery, to determine in the first instance whether there is sufficient evidence of knowing falsity to allow Rattigan to bring his claim before a jury.

*Id.* at 773.

After remand, the parties filed a status report identifying disagreements as to the appropriate way to proceed. (*See* May 15, 2013 Status Report [ECF No. 144].) Following a hearing on May 22, 2013, the Court ordered defendant to file a motion for summary judgment and plaintiff to file his opposition, including an affidavit detailing any additional discovery he believed was needed in order to rebut defendant's summary judgment motion. (*See* 5/22/2013 Hearing Tr. [ECF No. 151], at 33, 45-48.) The matter is now ripe for decision.

## ANALYSIS

### I. LEGAL STANDARD

A district court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Talavera v. Shah,* 638 F.3d 303, 308 (D.C. Cir. 2011). A "material fact is one that 'might affect the outcome of the suit under governing law.'" *Talavera,* 638 F.3d at 308 (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986)). For a dispute

about a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. at 248. In ruling on a motion for summary judgment, a court must "view all facts and draw all reasonable inferences in favor of the nonmoving party." *Brosseau v. Haugen,* 543 U.S. 194, 195 n.2 (2004); *Youngberg v. March,* 676 F.3d 1114, 1117 (D.C. Cir. 2012). A court should grant summary judgment only if "no reasonable jury could reach a verdict in [the non-moving party's] favor." *Jones v. Bernanke,* 557 F.3d 670, 674 (D.C. Cir. 2009).

Fed. R. Civ. P. 56(d)—formerly Fed. R. Civ. P. 56(f)—provides that on a motion for summary judgment a court may "(1) defer considering the motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." If a party is seeking a continuance, that party must " 'state[ ] concretely' why additional discovery is needed to oppose a motion for summary judgment." *Messina v. Krakower,* 439 F.3d 755, 762 (D.C. Cir. 2006) (quoting *Strang v. U.S. Arms Control & Disarmament Agency,* 864 F.2d 859, 861 (D.C. Cir. 1989)). The purpose of this rule is to "prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Dickens v. Whole Foods Market Group, Inc.,* No. 01-1054, 2003 WL 21486821, at *2 n.5 (D.D.C. Mar.18, 2003).

## II.     PLAINTIFF'S RETALIATION CLAIM

The anti-retaliation provision of Title VII states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Title VII's ban on retaliation applies to federal employers through § 2000e–16. *See Taylor v. Solis,* 571 F.3d 1313, 1320 (D.C. Cir. 2009). To demonstrate

unlawful retaliation, a plaintiff must show: "(1) that he opposed a practice made unlawful by Title VII; (2) that his employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the protected practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012). The first element is undisputed. Rattigan engaged in a protected activity when he alleged in October 2001, that his supervisors Cary Gleicher, Michael Pyszcymuka, and Leslie Kaciban discriminated against him based on his race and national origin. (*See* Mot. at 14-15.) Defendant argues, however, that no genuine issues of material fact remain on the second and third elements. *Id.* For the reasons discussed below, the Court agrees and therefore grants defendant's motion for summary judgment.

**A. No Supervisor Knowingly Reported False Information to the Security Division**.

To establish the second element of plaintiff's unlawful retaliation claim, he must demonstrate that his "*employer* took a materially adverse action against him." *See McGrath*, 666 F.3d at 1380 (emphasis added). At trial, the jury found that the Security Division investigation constituted a materially adverse action by plaintiff's employer. On appeal, the D.C. Circuit vacated this decision on the grounds that it violated *Egan* and Executive Order 12,986 by permitting the jury to second-guess the Security Division's decision to initiate an investigation upon receiving the OIO referral. *See Rattigan II*, 689 F.3d at 770. The Court of Appeals did not, however, dismiss the case. Instead, the Court held that even if the investigation did not qualify as a materially adverse action, the OIO referral could qualify as a materially adverse action under Title VII so long as "Leighton or other OIO officials chose to report other information that they knew to be false." *Id.* at 772.

But in order to withstand summary judgment, plaintiff not only must identify an allegedly adverse action, he must also present sufficient evidence that the individual taking this action was

a supervisor for whom his employer is vicariously liable.[3]  "An employer is vicariously liable

when a supervisor takes a tangible employment action . . . [because] [w]hen a supervisor makes a

tangible employment decision, there is assurance the injury could not have been inflicted absent

the agency relation." *Vance v. Ball State Univ.*, 133 S.Ct. 2434, 2442 (June 24, 2013) (internal

citations and quotation marks omitted); *see also Brady v. Office of the Sergeant at Arms*, 520

F.3d 490 (D.C. Cir. 2008).  The Supreme Court recently defined "a 'supervisor' for purposes of

vicarious liability under Title VII" as an individual "empowered by the employer to take tangible

employment actions against the victim. . . ." *Vance,* 133 S.Ct. at 2454 (June 24, 2013).[4]

Applying this standard, defendant argues that the only relevant actor for purposes of

plaintiff's retaliation claim is OIO Section Chief Michael Pyszcymuka. (*See* Mot. at 15-18.) The

parties agree that Pyszcymuka was responsible for referring the EC to the Security Division

while he served as plaintiff's supervisor.  At the time of the referral, Pyszcymuka knew that the

plaintiff had initiated an EEO complaint against him and other supervisors alleging

discrimination and a hostile work environment.  *See Rattigan I*, 643 F.3d at 979.   But, no other

supervisors were implicated.   Pyszcymuka's immediate supervisor, Leslie Kaciban, "did not

read the [EC]" and "did not see the document," and Cary Gleicher, plaintiff's immediate

---

[3] This is not to say that a co-worker's actions may never give rise to a Title VII retaliation claim.  Yet, it is well-established that co-workers "differ radically from supervisors in the scheme of vicarious liability." *Vinson v. Taylor*, 753 F.2d 141, 147 n.45 (D.C. Cir. 1985); *see also Vance v. Ball*, 133 S.Ct. 2434, 2441 (June 24, 2013) ("[A]n employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior. Courts have generally applied this rule to evaluate employer liability when a co-worker harasses the plaintiff." (internal quotations and footnotes omitted)). Plaintiff does not argue for the application of a negligence theory in this case.  Rather, he implicitly accepts that supervisory liability is appropriate by arguing that Leighton's actions should be "imputed" to his supervisors. (*See* Opp. at 26).  Moreover, plaintiff would be unable to prevail under a negligence theory without running afoul of the Court of Appeal's "knowingly false" standard for the reasons discussed in *Rattigan II*.  *See* 689 F.3d at 768-770.

[4] The Court of Appeals did not have the benefit of the Supreme Court's decision in *Vance* when deciding *Rattigan II*.  That case concerned a hostile work environment claim, not a retaliation claim.  However, the Supreme Court did not limit its analysis to hostile work environment claims.  Instead, it articulated the standard for supervisor liability "under Title VII." 133 S.Ct. at 2454.

supervisor, played no meaningful role in the referral. (*See* Def.'s Ex. K, Kaciban Dep., Jan. 9, 2008, at 136; 7/24/2009 AM Trial Tr. at 35-38.)

It is undisputed that Pyszcymuka was not the author of the EC. Rather, the EC was drafted by Donovan Leighton, an OIO Special Agent, temporarily assigned to the Riyadh office. *See Rattigan I*, 643 F.3d at 978. Plaintiff concedes that Leighton never served as his supervisor. (*See* Pl.'s Opp. to Def.'s Statement of Material Facts [ECF No. 150-2] ("Leighton was not Rattigan's supervisor in 2001 or 2002. [Plaintiff's] Response: Admitted."); *see also* 7/21/2009 PM Trial Tr. at 56 ("Q. ... [W]hat does the desk officer do. How do they fit into the organization? A. ... "They're not our bosses."").) Pyszcymuka did, however, refer Leighton's EC to the Security Division without independently investigating the accuracy of its allegations. In plaintiff's words, Pyszcymuka had "no firsthand knowledge of anything that happened in Riyadh," he merely forwarded "what someone else told him and what he believed." (*See* 7/27/2009 PM Trial Tr. at 20; Def.'s Ex. J, Rattigan Dep., Dec. 7, 2007, at 195.)

The evidence shows that prior to drafting the EC, Leighton met with Pyszcymuka for between one hour and one hour and fifteen minutes. (*See* 7/27/2009 PM Trial Tr. at 60.) Leighton then provided Pyszcymuka with a draft of the EC, which Pyszcymuka forwarded to his assistant, Walter Smith, for review. (*See* Pl.'s Trial Ex. 17.) Smith informed Pyszcymuka that Leighton's EC was "much too long, and in some cases, inflammatory and unsupported fact-innuendo, hearsay, etc." Smith also explained that "there are a number of issues within, other than management . . . [including] the allegation of fraternizing with FNs [Foreign Nationals] and sexual relations with the same." (*Id.*) Pyszcymuka forwarded these comments to Leighton along with a note instructing him to "focus on management matters and potential security concerns that may exist in Riyadh." (*See* Pl.'s Trial Ex. 18.) After Leighton edited the EC, Pyszcymuka

referred the document directly to the Security Division without further review or alteration. (*See* Pl.'s Trial Ex. 20.)

Considering these facts in the light most favorable to the plaintiff, there is no evidence to support an inference that plaintiff's supervisor knowingly referred false statements to the Security Division. At most, this evidence demonstrates that (1) Pyszcymuka knew that Leighton drafted an EC identifying security concerns about the plaintiff; (2) he encouraged Leighton to focus his EC on security concerns; (3) he forwarded Smith's critiques to Leighton; and (4) he never personally investigated the truthfulness of the statements prior to referring the EC to the Security Division.

But, as is clear from *Rattigan II*, it is not enough that Pyszcymuka (or any other reporting employee) failed to independently investigate the truthfulness of statements made in the referral to the Security Division. 689 F.3d at 769. To the contrary, the Court of Appeals emphasized that in order to demonstrate the existence of a materially adverse action, plaintiff must show that "the *reporting employee actually knew* at the time of reporting that the information he provided was false." *Id.* at 770 (emphasis added). The Court reasoned that this "knowingly false" standard is essential in the security clearance context for two reasons. First, under *Egan*, the Security Division "need[s] all the evidence they can get to 'control access to information bearing on national security and to determine whether an individual is trustworthy to . . . [have] access to such information.'" *Id.* at 769 (citing *Egan*, 484 U.S. at 527). Indeed, the Security Division needs "full access to even unsubstantiated and doubtful information in order to make the sensitive predictive judgments that *Egan* protects." *Rattigan II*, 689 F.3d at 769. Second, under

Executive Order 12,968, employees are required to report "overheard rumors and small details that may ultimately prove irrelevant."[5] *Id.*

In short, the knowingly false standard announced in *Rattigan II* presents a much higher burden for a Title VII plaintiff than is generally required in a non-security clearance context. As the D.C. Circuit held in *Brady v. Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008), the general rule in a retaliation case is that summary judgment is warranted where a reasonable jury could find that the non-retaliatory justification proffered by the employer is a mere pretext for retaliation. Under this standard, as long as a supervisor's "belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying . . . ." *Id.* But this standard was ultimately rejected by the Circuit in this case.[6]

In an attempt to rescue his retaliation claim, plaintiff offers the novel theory that a non-supervisor's knowing falsities—in this case, the alleged knowing falsities of Donovan Leighton—must be imputed to his supervisor, Michael Pyszcymuka. (Opp. at 26.) Though plaintiff concedes that Leighton never served as his supervisor, plaintiff argues that "[t]he

---

[5] The wisdom of this approach may well be reinforced by recent events, including the WikiLeaks scandal, Edward Snowden's public disclosure of classified documents, and the September 16, 2013 shooting at the Navy Yard by a federal contractor with a security clearance.

[6] It is arguable that plaintiff might be unable to satisfy the far less rigorous "pretext" standard set forth in *Rattigan I*. For example, in *Brady*, an employee of the Office of the Sergeant at Arms working in the House of Representatives parking garage was demoted after allegations of sexual harassment by his co-workers. 520 F.3d at 492. He sued his employer for retaliation on the grounds that the sexual harassment allegations were a mere pretext for demoting him because of his race. *Id.* On defendant's motion for summary judgment, the Court of Appeals held that "the question is not whether the underlying sexual harassment incident occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying sexual harassment incident occurred." *Id.* at 495 (emphasis in original). In this case, plaintiff has conceded that Pyszcymuka forwarded "what somebody else told him and what he believed [to be true]." (Def.'s Ex. J, Rattigan Dep., Dec. 7, 2007, at 195.) This could well be enough to grant summary judgment even under a pretext analysis, but it is certainly fatal to plaintiff's claim under *Rattigan II*'s more demanding knowingly false standard.

evidence clearly shows, and a jury [could] reasonably find, that Leighton was operating on behalf of and at the behest of OIO management . . . [and therefore his] knowing falsities are imputed to them." (*Id.*)

Not only is plaintiff unable to offer any evidence that Leighton made false statements "on behalf of and at the behest of" his supervisors,[7] but the Court concludes that permitting a jury to reach such a conclusion would violate *Rattigan II*.  The Court of Appeals held that a jury may only consider "what a *particular person knew* at a particular time and whether *that person* intentionally reported false information about a co-worker."[8] *Rattigan II*, 689 F.3d at 771 (emphasis added).  If the Court were to adopt the standard advocated by plaintiff, the "knowing falsity standard" would functionally be transformed into the "pretext standard" that *Rattigan II* explicitly rejected.

Leighton was never plaintiff's supervisor, and therefore, it is not enough to try and prove that his statements in the EC were knowingly false.[9]  Instead, the Court may only consider the actions and knowledge of Pyszcymuka as a supervisor.   Because it is undisputed that Pyszcymuka referred the EC without having any knowledge of the truth or falsity of the

---

[7] Plaintiff's most compelling argument that Leighton acted at the behest of OIO supervisors is his deposition testimony that OIO management may have used him, as an African-American, to retaliate against Rattigan. (7/23/2009 PM Trial Tr. at 36.) However, plaintiff has failed to identify any evidence that Leighton's supervisors instructed him to investigate Rattigan's behavior, draft the EC, or what allegations to include.  Indeed, plaintiff has provided no facts to support Leighton's suspicion that he may have been used by his supervisors.

[8] Defendant also points out in a footnote that the plaintiff "wrongly suggests that the court can infer 'knowing falsity' from evidence that, in his view, tends to suggest retaliatory animus."  (Def.'s Reply Mem. in Further Support of Mot. for Summ. J. ("Reply") [ECF No. 156], at 6 n.3.)  Defendant is correct that "this argument is entirely backwards.  Retaliatory animus is an ultimate issue in the case, not a method of proving knowing falsity." (*Id.*)

[9] For this reason, it is unnecessary to consider the specific allegations of Leighton's knowing falsity described in plaintiff's opposition.  (*See* Opp. at 26-39.)

allegations therein, he did not take a materially adverse action for which his employer is vicariously liable.

### B. No Reasonable Jury Could Find that Retaliatory Animus Was the But-For Cause of the Allegedly Adverse Action.

In addition to the lack of a materially adverse action, the Court also concludes that the plaintiff has failed to demonstrate the existence of a genuine issue of material fact as to the third element of his retaliation claim—"that the employer took the action *'because' the employee opposed the practice.*" *See McGrath*, 666 F.3d at 1380 (emphasis added). Since the Court of Appeals handed down its decision in *Rattigan II*, the Supreme Court issued a ruling that clarifies the level of causation necessary in a Title VII retaliation case. In *University of Texas Southwestern Medical Center v. Nassar*, a doctor of Middle Eastern decent sued a state university for retaliation, alleging that that the hospital with which the university was affiliated revoked a job offer because he complained that his supervisor discriminated against him on the basis of race and religion. 133 S.Ct. 2517, 2524 (June 24, 2013). The Fifth Circuit denied defendant's motion for summary judgment on the ground that a reasonable jury could find that the plaintiff's protected activity was a "motivating factor" for the materially adverse action. *Id.* However, the Supreme Court reversed and remanded holding that "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a *but-for cause of the alleged adverse action.*" *Id.* at 2534 (emphasis added).

Under the Supreme Court's decision in *Nassar* and the Court of Appeals' decisions in *Rattigan I* and *II*, the question this Court must consider on remand is whether a reasonable jury could find that plaintiff's protected activities were the *but for cause* of the defendant's allegedly adverse action without running afoul of *Egan* and Executive Order 12,968. Under this standard, it is not sufficient for plaintiff to demonstrate that a reasonable jury could find that retaliatory

animus by plaintiff's supervisor was *a* cause for the referral. Rather, plaintiff must demonstrate that there is a genuine issue of material fact as to whether retaliatory animus was *the* cause for the referral.

The plaintiff is unable to meet this burden in light of the Court of Appeals holding that a number of allegations in the referral were not knowingly false, but were objectively true. These allegations included that: (1) Rattigan occasionally wore Saudi attire at the United States Embassy; (2) he restricted communications between Saudi intelligence and FBI employees; (3) Saudi intelligence attempted to find Rattigan a wife; and (4) Rattigan could only be contacted through Saudi intelligence while participating in the Hajj. *Rattigan II*, 689 F.3d at 772. Based on the evidence at trial and the reasoning of *Rattigan II*, these allegations all highlight legitimate security concerns that plaintiff was under "foreign influence." Indeed, Edward Shubert, the Security Division official who authorized the investigation, testified at trial that "foreign influence" was one of two "primary . . . security concerns" in the referral that led him to authorize an investigation of the plaintiff. (7/27/2009AM Trial Tr. at 31.)

Given the presence of unrebutted facts that implicated legitimate security concerns, it would be impossible for a jury to conclude that retaliatory animus was the but-for cause of the referral. First, if a jury were to evaluate whether the reason the EC was referred was retaliation, that assessment would necessarily allow the jury to second-guess the Security Division's conclusion, as testified by Shubert, that the issue of foreign influence warranted further investigation. In both of its decisions, the Court of Appeals made clear that permitting a jury to question the motives and conclusions of the Security Division would violate *Egan. See Rattigan I*, 643 F.3d at 985; *Rattigan II*, 689 F.3d at 769. Moreover, in *Rattigan II*, the Court of Appeals emphasized that it would "discourage critical reporting" if the Court were to adopt a standard

that allowed jurors to evaluate the motives of employees complying with Executive Order 12,968's "expectation that employees will report . . . rumors and small details that may ultimately prove irrelevant." *Rattigan II*, 689 F.3d at 769.  Thus, since the EC contained accurate information that was sufficient to raise security concerns, the Court may not, consistent with *Rattigan II*, allow the jury to assess the Security Division's decision to initiate an investigation of the plaintiff based on a suggestion of questionable "foreign influence" (as opposed to "personal concerns").

Second, a reasonable jury should not be permitted to parse the EC.  The referral as a whole is the alleged adverse action, not the inclusion of any particular statement that plaintiff might wish to challenge as knowingly false. Where the Security Division chose to investigate, at least in part, on the basis of particular statements in the EC that are admittedly true, it necessarily follows that plaintiff cannot prove causation without violating *Egan*.  While it may not be necessary that every allegation in the EC is false to withstand summary judgment under *Rattigan II*, where facts present enough information to justify a security investigation, a jury may not be permitted to find that the real motive for some statements was not, as the Security Division concluded, legitimate security concerns.

Third, it is not possible based on the record in this case for a jury to find that plaintiff's alleged damages resulted from the referral of the EC, as opposed to the investigation itself. On April 12, 2002, Pyszcymuka referred Leighton's EC to the Security Division.  *Rattigan*, 604 F. Supp. 2d. at 44.  On April 16, 2002—a mere four days later—the Security Division advised the Inspection Division that it would investigate Rattigan and others in the Riyadh Office.  *Id.* Roughly six days later, on or about April 22, 2002, two assistant inspectors, Cheryl Tucker and Carlos Cintron, began their investigation.  *Id.*  Because the Security Division acted so swiftly, it

is not clear that Rattigan was even aware of the referral prior to the commencement of the investigation. Indeed, at trial, Rattigan attributed his damages to the initiation of the investigation and not to the OIO referral. For instance, during his closing argument counsel argued that "this investigation was sufficient to qualify as an adverse employment decision. It was threatening to his career." (7/28/2009 Trial Tr. at 23.)

The Court recognizes that a referral could constitute a materially adverse action because, in the Court of Appeals words, it "created the very real possibility not only that Rattigan would face a stressful and potentially reputation-damaging investigation, but also that the FBI would revoke his security clearance and terminate his employment." *Rattigan I*, 643 F.3d at 986. Yet, based on the facts of this case, a jury cannot realistically be expected to perform the mental gymnastics of determining what damages were caused by the referral and what were caused by the investigation.[10]

The Court of Appeals left it to this Court to "ensure that the jury does not second-guess the Security Division's decision to initiate the investigation . . . [because] even if the charge of retaliation focuses only on OIO's referral, the risk remains that unless the district court takes precautions, the jury could nonetheless second-guess the Security Division's decision to initiative the investigation." *Rattigan I*, 643 F.3d at 987. Because the investigation occurred almost immediately after Pyszcymuka referred the EC, any alleged damages would necessarily implicate the Security Division's decision to investigate and a jury would need to revisit the Security Division's decision in violation of *Egan* and the Circuit's rulings in *Rattigan I* and *II*.

---

[10] In *Rattigan I*, the Court of Appeals "recognize[d] that limitations required to ensure compliance with *Egan* may make it impossible for some plaintiffs to mount evidence sufficient to allow a reasonable jury to believe retaliation had occurred. In such cases, the district court will need to enter judgment for the government." 643 F.3d at 989.

Finally, under the Supreme Court's recent ruling in *Nassar*, it is now clear that a Title VII retaliation claim cannot rely on a mixed motive theory. *See* 133 S.Ct. at 2534. In order to make that assessment, the jury would have to evaluate the validity of, and motives behind, the referral as a whole, including the truthfully reported security concerns that the Division found worthy of investigation. Prior to *Nasser*, as previously argued by plaintiff, it might have been possible for a jury to find liability for decisions based on a mixture of legitimate and illegitimate considerations because this mixture would show that retaliatory animus was a motivating factor. (*See* Def.'s Reply Attach. 2, Appellee's Resp. to Appellant's Pet. for Reh'g *En Banc*, at 14-15.) Now, such an approach is prohibited.

Plaintiff concedes that the referral included true statements that raised legitimate security concerns. (Opp. at 24.) However, plaintiff argues that "[t]he D.C. Circuit was perfectly clear: Rattigan can prove his claim without running afoul of *Egan*, by showing that OIO referred knowingly false security concerns [and] that the referral was made *because of* Rattigan's complaints about OIO's discriminatory treatment of him." (*Id.* at 25-26 (emphasis in original).) In plaintiff's view, the Court of Appeals would not have remanded the case if *Egan* barred his retaliation claim. Therefore, according to plaintiff, the existence of even one false statement "casts doubt on the legitimacy of the entire EC and its referral" and a jury should be permitted to weigh that evidence and conclude that the but-for cause of defendant's adverse actions was retaliation. (*See id.* at 30.) Because "Rattigan's claim is provable through clear-cut evidence that the EC would not have been written much less referred to the Security Division if not for the retaliatory motives of OIO supervisors," plaintiff points out in a footnote, *Nassar* "presents no obstacle to a jury deciding in Rattigan's favor." (*Id.* at 26 n.4.)

As explained herein, the Court cannot agree. Jurors cannot be asked to determine the motivation for each statement in the EC in isolation. Plaintiff's alleged damages arose not from individual statements in the EC, but from the referral itself. Under *Nassar*, the existence of true allegations implicating legitimate security concerns make it impossible for a jury to find that the EC would not have been referred but-for a retaliatory animus. Without second guessing the Security Division, a reasonable jury could, at most, conclude that the motivations for referring the EC were mixed. At the time the Court of Appeals handed down its rulings this may have been sufficient, but since *Nassar*, it clearly is not.

## III.    PLAINTIFF'S REQUEST FOR FURTHER DISCOVERY

Plaintiff argues that *Rattigan II* offers a "fairly explicit roadmap following remand, which included allowing Plaintiff to conduct further discovery on the 'knowing falsity' standard before the court entertained a motion for summary judgment." (Opp. at 40.) In support of this contention, plaintiff cites to the Court of Appeals statement that:

> [b]ecause we set forth this knowingly false standard for the first time on appeal, Rattigan had little reason to develop evidence of knowing falsity in the district court. Given this . . . we shall remand for the district court, *after permitting any necessary discovery*, to determine in the first instance whether there is sufficient evidence of knowing falsity to allow Rattigan to bring his claim before a jury.

*Rattigan II*, 689 F.3d at 773 (emphasis added). Defendant responds that plaintiff has failed to identify any additional discovery that is "necessary" for purposes of this summary judgment motion. (Mot. at 23-24.) Because the Court agrees, plaintiff's request for Rule 56(d) discovery will be denied.

In order to determine how to proceed on remand, this Court held a hearing on May 22, 2013. At this hearing, the Court expressed concern that plaintiff had failed to specifically identify any discovery necessary to respond to defendant's summary judgment motion. (*See*

5/22/2013 Hearing Tr. at 36.) Instead, plaintiff proposed vague and boundless discovery, including discovery as to issues far beyond the scope of the narrow question presented on remand. (*See generally* 5/22/13 Hearing Tr.) For example, plaintiff repeatedly asserted the need for information on what OIO officials should have known. (*Id.* at 23, 27-28.) For this reason, the Court decided that it was best to proceed by allowing the defendant to file its summary judgment motion first. Then, plaintiff could file an opposition with a Rule 56(d) affidavit detailing the discovery necessary for the Court to reach a decision on the summary judgment motion. (*Id.* at 36.)

The Court is expressly permitted under Fed. R. Civ. P. 56(d) to postpone ruling on a summary judgment motion in order to "allow time to obtain affidavits or declarations or to take discovery." In order to permit this discovery, the Court must find that "additional discovery is needed to oppose [the motion]." *Messina v. Krakower,* 439 F.3d 755, 762 (D.C. Cir. 2006) (quoting *Strang v. U.S. Arms Control & Disarmament Agency,* 864 F.2d 859, 861 (D.C. Cir. 1989)). Generally, Rule 56(d) "prevent[s] 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Dickens v. Whole Foods Market Group, Inc.,* No. 01-1054, 2003 WL 21486821, at *2 n. 5 (D.D.C. Mar.18, 2003). However, since in this case discovery was conducted for more than two and a half years and a seven-day jury trial occurred, plaintiff cannot rely on mere generalities to justify the reopening of discovery.

Along with his opposition, plaintiff's attorney filed a declaration "set[ting] forth the specific areas of further discovery, ground in the knowingly false standard, that are necessary." (Opp. at 40.) In this declaration, plaintiff's attorney listed several areas of "necessary discovery," including: (1) "discovery concerning Donovan Leighton," including his credibility

and knowledge of particular facts; (2) depositions of additional FBI officers identified by Leighton in his EC; and (3) discovery regarding interactions between Michael Pyszczmuka, Walt Smith, Cary Gleicher, Leslie Kaciban, and Donovan Leighton. (*See* Decl. of Jonathan C. Moore in Opp. to Def.'s Mot. for Summ. J. ("Moore Decl.") at ¶¶ 5-10.)

The Court finds that none of these proposed areas of discovery is necessary in order to rule on defendant's motion for summary judgment. First, concerning supervisory liability, plaintiff testified at his deposition and at trial that Pyszcymuka was his supervisor and that Leighton was not. He further testified that Pyszcymuka did not know the truth or falsity of the allegations in the EC because he was never in Riyadh. (*See* 7/27/2009 PM Trial Tr. at 20; Def.'s Ex. J, Rattigan Dep., Dec. 7, 2007, at 195.) Plaintiff had the opportunity and incentive to explore what Pyszcymuka knew or did not know during prior discovery and at trial. No further discovery is therefore necessary on this point.[11] Second, concerning but-for causation, the Circuit Court found that the referral included true statements identifying legitimate security concerns such that a reasonable jury could, at most, find that the motive for the referral was mixed. In light of the Supreme Court's intervening decision in *Nassar,* further discovery regarding knowingly false statements is therefore unnecessary. For these reasons, additional discovery will not be permitted.

---

[11] Moore's Declaration demonstrates the danger of permitting further discovery on issues not presently before the Court. Despite the Court's clear instructions that *Rattigan II* explicitly forecloses an inquiry into what any individual "should have known," the declaration persists in requesting discovery on "whether the information contained in the Leighton EC was knowingly false and the issue of whether anyone in OIO management knew *or should have known that the information was knowingly false* . . . ." (Moore Decl. at ¶ 10 (emphasis added).)

## CONCLUSION

Accordingly, and for the reasons stated above, defendant's motion for summary judgment is **GRANTED**. A separate Order accompanies this Memorandum Opinion.

_____/s/_____

ELLEN SEGAL HUVELLE
United States District Judge

Date: October 31, 2013.